*(1)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**FARHI SAEED BIN MOHAMMED,**<br>   Petitioner,<br><br>*v.*<br><br>**GEORGE W. BUSH,** *et al.,*<br>   Respondents.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

**Civil Action No. 05-cv-1347 (GK)**

</td></tr>
</table>

### MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH 30-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioner (ISN #311) respectfully move for an order requiring Respondents to provide counsel for Petitioner and the Court with advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Base in Cuba. Respondents have contemplated or are contemplating removal of Petitioner from Guantánamo to foreign territories. Petitioner has reason to believe that such a transfer could result in his being subjected to torture or indefinite imprisonment without due process of law. The basis for Petitioner's assertion that Respondents are so contemplating transfer is an unclassified notice to that effect (See: Notification of the Decision of an Administrative Review Board ICO ISN 311 to Depart Guantanamo Bay Cuba dated September 24, 2007, attached hereto as Exhibit "A") the formal notice from Respondents that as a result of an Administrative Review Board ("ARB") review he has been "cleared for release." Petitioner

is requesting the advance notice of removal to enable his counsel to contest any such removal from Guantánamo and preserve the jurisdiction of the Court in this matter.

## STATEMENT OF FACTS

Petitioner is a citizen of Algeria who is being detained as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba since 2002.  As detailed in the habeas petition he has filed he denies being an "enemy combatants," and contends he is being detained in violation of the Constitution, treaties and laws of the United States.

On June 12, 2008, the Supreme Court reversed the decision of the Court of Appeals, ruling that prisoners at Guantanamo have *habeas corpus* rights protected under the U.S. Constitution; the review procedures of the Detainee Treatment Act are not an adequate substitute for *habeas corpus*; and the Military Commissions Act, insofar as it purported to strip the courts of *habeas corpus* jurisdiction, was unconstitutional.  Boumediene v. Bush, ___ S.Ct. ___, 2008 WL 2369628 (June 12, 2008).  The Court stated that it was now up to the trial courts to resolve questions regarding "the legality of . . . detention" of Guantanamo detainees. Id. at *8. The Court stated that the "detainees in these cases are entitled to a prompt habeas corpus hearing."

Petitioner has reason to fear that he will be transferred into the custody of the government of Algeria or a third country for continued illegal detention without due process of law.  On information and belief, a number of detainees have been removed to countries where they have been imprisoned and denied access to the courts, and in most if not all cases such detainees were "cleared for release or transfer" by the military. There are currently at least 64 detainees cleared for release or transfer.

Petitioner in the instant case has reason to fear he will be transferred to a country where he will be tortured and/or detained indefinitely without due process of law, particularly his native

Algeria, a country known to treat repatriated prisoners harshly, having codified the right to hold such a person without charges from 2 days to 2 years in Article 87 of the Algerian criminal code.

Since Sept. 11, 2001 the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries such as Egypt, Pakistan, Afghanistan, and Kuwait where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States. *See, e.g.,* Hearings of the Foreign Affairs Subcommittee on International Organizations, Human Rights, and Oversight on the Hearings and Briefings on The Use of Diplomatic Assurances in Renditions, June, 2008. Chairman Delahunt's panel heard testimony on a number of specific cases of rendition to torture, including but not limited to the case of Maher Arar, a Canadian of Syrian origin who was stopped at JFK Airport and on the basis of assurances that he would not be tortured, was sent to Syria. Mr. Arar was subsequently tortured during his one year detention there. A newly released report from the Department of Homeland Security's Inspector General raises fresh questions about the sufficiency of those assurances. According to State Department reports, torture has been widely used on prisoners in a number of middle eastern countries. *See, e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture,* L.A. Times, Jan. 13, [2005], at A1 ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where,

By way of one example out of the many possible, Guantánamo detainee Mamdouh Habib was rendered to Egypt by the United States. During his six months in Egyptian custody, Mr. Habib was allegedly tortured without mercy:

> He said that he was beaten frequently with blunt instruments, including an object that he likened to an electric "cattle prod." And he was told that if he didn't confess to belonging to Al Qaeda he would be anally raped by specially trained dogs. . . . Habib said that he was shackled and forced to stand in three torture chambers: one room was filled with water up to his chin, requiring him to stand on tiptoe for hours; another chamber, filled with water up to his knees, had a ceiling so low that he was forced into a prolonged, painful stoop; in the third, he stood in water up to his ankles, and within sight of an electric switch and a generator, which his jailers said would be used to electrocute him if he didn't confess.

Mayer, *Outsourcing Torture* at [¶ 54.] The credibility of Mr. Habib's account is bolstered by the State Department, which has consistently identified the Egyptian government as a practitioner of torture. In a report released on February 28, 2005, for example, the State Department found that "there were numerous, credible reports that security forces tortured and mistreated detainees" and that "torture and abuse of detainees by police, security personnel, and prison guards remained common and persistent." Dep't of State, *Country Reports On Human Rights Practices, Egypt 2004*, at http://www.state.gov/g/drl/rls/hrrpt/2004/41720.htm, § 1(c).

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner's request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004).

Each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioner are likely to succeed on the merits of their claims; and (4) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

(1) Petitioner stands to suffer immeasurable and irreparable harm – from to torture to possible death – at the hands of a foreign government. Transfer to another country, even if "only" for continued imprisonment, also circumvents Petitioner's right to adjudicate the legality of their detention in this Court, per *Boumedienne*.

(2) By contrast, Respondents, who have already held Petitioner for over six years, are asked only to provide counsel and the Court with adequate notice of any intended removal of Petitioner from Guantánamo. Respondents can suffer no conceivable harm from complying with such a request.

(3) Petitioner is likely to succeed on the merits of his claims. First, Petitioner has properly invoked the jurisdiction of this Court under *Boumediene,* and for the United States Government to remove Petitioner to countries that would afford no such protections would be to flout *Boumedienne* and defeat the jurisdiction the Supreme Court just affirmed. Secondly, the military has already cleared petitioner for release or transfer, rendering success on the merits extremely likely. Under such circumstances a preemptive transfer would also violate basic international legal norms embodied not only in the Geneva Conventions

but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment.

(4)    Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioner from the Court's jurisdiction. No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant - properly before the Court, represented by counsel, and wishing to implement the judicial branch's admonition that the other two branches no longer unconstitutionally deny him his day in court - be provided a meaningful opportunity to content his transfer into the hands of those who might torture him or detain him indefinitely.

## CONCLUSION

For the reasons discussed above, the motion should be granted.

Dated: June 20, 2008

Respectfully submitted,

Jerry Cohen
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
Tel: (617) 345-3000

OF COUNSEL:
Zachary Katznelson
Cal. Bar. No. 209489
Legal Director
Reprieve
PO Box 52742
London EC4P 4WS
United Kingdom
Tel: 011-44(0) 207-353-4640
Fax: 011-44(0) 207-353
Zachary@Reprieve.org.uk

Stewart Eisenberg
WEINBERG & GARBER, PC
71 King Street
Northampton, MA 01060

Tel: (413) 582-6886
Fax: (413) 582-6881
buz.e@verizon.net

6

## CERTIFICATE OF SERVICE AND DISCUSSION

I hereby certify that a true and correct copy of the foregoing Motion has been served by Express Mail, Return Receipt Requested, to the following person:

Terry Henry, Esq.
U.S. Department of Justice
20 Mass. Avenue, NW Room 7226
Washington, DC 20529-0001
Attorney for Respondent

On this 20th day of June, 2008.

It is further certified per Local Rule 7(m) (LCvR7.1(m)) that counsel sought to set up a discussion with a counsel for Respondent by an email message but had no response.

Jerry Cohen

7

J:\Docs\31549\00001\01256929.DOC