UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

FILED WITH THE
COURT SECURITY OFFICER
CSO: *Strause*
DATE: *11/20/09*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FARHI SAEED BIN MOHAMMED,  :
et. al.,                   :
                           :
    Petitioners,          :
                           :
    v.                    :    Civil Action No. 05-1347 (GK)
                           :
BARACK H. OBAMA, et. al.,   :
                           :
    Respondents.          :
                           :

### MEMORANDUM OPINION

Petitioner Farhi Saeed Bin Mohammed ("Mohammed" or "Petitioner") has been detained since 2002 at the United States Naval Base at Guantanamo Bay, Cuba. Respondents ("the Government") argue that his detention is justified under the Authorization for the Use of Military Force, Pub. L. No. 107-40 § 2(a), 115 Stat. 224, 224 (2001) ("AUMF"), which grants the Executive the power to detain individuals engaged in certain terrorist activities. Petitioner disagrees, and has filed a petition for a writ of habeas corpus [Dkt. No. 1].

The matter is before the Court on Cross-Motions for Judgment on the Record [Dkt. Nos. 215-17]. Upon consideration of the Motions, the Oppositions, extensive oral argument and accompanying exhibits, and the entire record herein, Mohammed's habeas corpus petition and Motion are hereby **granted**.

~~SECRET~~

SECRET

Because of the length of this Opinion, the Court includes the following Table of Contents:

I.   Procedural History....................................3

II.  Standard of Review...................................7

III. Analysis............................................10

     A.   Evidentiary Presumptions........................10

     B.   Mosaic Theory..................................13

     C.   Government Allegations.........................16

          1.   Use of False Names and Documents...........17

          2.   Attendance at London Mosques...............20

          3.   Recruitment and Travel to Afghanistan.......23

          4.   Guesthouse Stay............................28

          5.   Training...................................40

               a.   The Government's Evidence.............42

               b.   Petitioner's Attacks on the
                    Government's Evidence.................47

                    i.   Torture Allegations..............48

                    ii.  Legal Analysis...................57

                    iii. Reliability of Evidence
                         Procured Subsequent to Torture....61

               d.   Remaining Allegations Regarding
                    Training.............................70

          6.   Participation in Battle....................72

IV.  Conclusion..........................................75

SECRET
-2-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

## I. PROCEDURAL HISTORY

Petitioner filed his habeas corpus petition on July 6, 2005.
After filing, there was extensive preliminary litigation regarding
the Court's jurisdiction to entertain detainees' petitions, the
applicability of various statutes, and the appropriate procedures
to be used.

After more than six years of litigation, the most important
legal issue was resolved by the Supreme Court in <u>Boumediene v.
Bush</u>, 553 U.S. ___, 128 S. Ct. 2229 (2008). The Court ruled that
detainees at Guantanamo Bay, none of whom are citizens of the
United States, are entitled to bring habeas petitions under Article
I of the Constitution, and that the federal district courts have
jurisdiction to hear such petitions.

The Court did not define what conduct the Government would
have to prove, by a preponderance of the evidence, in order to
justifiably detain individuals--that question was left to the
District Courts. <u>Id.</u> at 2240 ("We do not address whether the
President has the authority to detain these petitioners nor do we
hold that the writ must issue. These and other questions regarding
the legality of the detention are to be resolved in the first
instance by the District Court."). Nor did the Supreme Court set
forth specific procedures for the District Courts to follow in
these cases.

SECRET

-3-

SECRET

Boumediene was, however, definitive on at least two points: first, that the detainees are entitled to a prompt hearing, id. at 2275 ("The detainees in these cases are entitled to a prompt habeas corpus hearing."), and, second, that the District Courts are to shape the contours of those hearings, id. at 2276 (finding that balancing protection of the writ and the Government's interest in military operations, "and the other remaining questions[,] are within the expertise and competence of the District Court to address in the first instance.").

In an effort to provide the prompt hearings mandated by the Supreme Court, many of the judges in this District agreed to consolidate their cases before former Chief Judge Thomas Hogan, for purposes of streamlining procedures for, and management of, the several hundred petitions filed by detainees. See Order (July 1, 2008) [Civ. No. 08-442, Dkt. No. 1]. On November 6, 2008, after extensive briefing from Petitioners' counsel and the Government, Judge Hogan issued a Case Management Order ("CMO") to govern the proceedings. This Court adopted, in large part, the provisions of that Order, while modifying it somewhat, as noted in Appendix A to Dkt. No. 147.

Much pre-hearing activity has taken place under this Court's CMO. The Government has filed the exculpatory evidence, automatic discovery, and additional discovery required under the CMO. The

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Government filed its Factual Return for Mohammed on November 15, 2005 [Dkt. No. 10] and October 26, 2006, and amended it on November 26, 2008.  The Petitioner responded by filing his Traverse on March 17, 2009 [Dkt. No. 232].  After a period of extensive discovery, both parties filed substantial briefs accompanied by voluminous exhibits.

On July 14, 2009, the Court set September 3, 2009, as the date for the Merits Hearing on the Cross-Motions for Judgment on the Record for Petitioner.  Mohammed elected not to listen in via telephone to the unclassified opening arguments, and also chose not to testify via video-conference from Guantanamo Bay [Dkt. No. 230]. Parties presented their arguments during a two-day, mostly classified session.  At the close of the Hearing, the Court ordered additional briefing on the issue of the admissibility of evidence procured by torture, or procured from an individual who had been tortured prior to providing the evidence upon which parties rely. Minute Order (Sept. 4, 2009).  On September 28, 2009, parties submitted briefs setting forth their positions on this issue [Dkt. Nos. 247-48].

Between the filing of Mohammed's habeas corpus petition and the Merits Hearing, the Government has made at least two determinations regarding his detention status. Petitioner was cleared for release by the Administrative Review Board ("ARB") in

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

September of 2007. See Pet.'s Mot. To Lift the Stay of Proceedings, Order the Government to Provide Factual Return and Set a Scheduling Conference at 2 n.1 [Dkt. No. 33]. ███████████████

███████████████████████████████████████████████

███████████████████████████████ See Sealed Notice of Status [Dkt. No. 189]. In advance of that decision, parties filed a Joint Motion to Stay Proceedings [Dkt. No. 175], which the Court granted on May 13, 2009. Another stay was entered at the request of the Government on June 11, 2009. See Order [Dkt. No. 193].

██████████████████████████████████████████████

████████████████ all stays in the case were lifted on July 14, 2009, over the Government's objection, thereby allowing the Merits Hearing to proceed. See Order (July 14, 2009) (setting dates for Merits Hearing) [Dkt. No. 205].

There is one other procedural event that bears mention. ██

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ Notice Pursuant to the Court's July 10, 2008 Order [Dkt. No. 56]. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ [Dkt. No. 212]; ███████████████████████████████████████ [Dkt. No.

SECRET

-6-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

67]. 

by the Court of Appeals in <u>Kiyemba v. Bush</u>, 561 F.3d 509 (D.C. Cir. 2009), <u>reh'g</u> and <u>reh'g en banc denied</u>, No. 05-5487 (July 27, 2009). <u>See</u> Order (Sept. 29, 2008) [Dkt. No. 80].

[Dkt. No. 202; Civ. No. 08-442, Dkt. No. 1824]. That motion is pending.

## II. STANDARD OF REVIEW

The Government bears the burden of establishing that detention is justified. <u>See</u> <u>Boumediene</u>, 128 S. Ct. at 2270; <u>Hamdi</u>, 542 U.S. 507, 533-34 (2004). It must do so by a preponderance of the evidence. Order, Appendix A at § II.A (Feb. 12, 2009) [Dkt. No. 147-2]; <u>see also</u> <u>Basardh v. Obama</u>, 612 F. Supp. 2d 30, 35 n.12 (D.D.C. 2009).

Initially, the Government took the position that both Article II of the Constitution and the AUMF granted the President the authority to detain individuals. <u>See</u> <u>Gherebi v. Obama</u>, 609 F. Supp. 2d 43, 53 n.4 (D.D.C. 2009). In December of 2008, the

SECRET

-7-

SECRET

Government asserted, "[a]t a minimum, . . . the ability to detain as enemy combatants those individuals who were part of, or supporting, forces engaged in hostilities against the United States or its coalition partners and allies." Resp't's Statement of Legal Justification For Detention at 2 [Dkt. No. 105].

Since the change in Administrations, the Government has abandoned Article II as a source of detention authority, and relies solely on the AUMF. Gherebi, 609 F. Supp. 2d at 53 n.4. Further, it no longer uses the term "enemy combatant." Its refined position is:

> [t]he President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

Resp't's Revised Mem. Regarding the Gov's Detention Authority Relative to Detainees Held at Guantanamo Bay at 3 [Dkt. No. 153].

In Gherebi, Judge Reggie B. Walton of this District Court ruled that the Government has the authority to detain individuals who were part of, or substantially supported, al-Qaida and/or the Taliban, provided that those terms "are interpreted to encompass only individuals who were members of the enemy organization's armed

SECRET

forces, as that term is intended under the laws of war, at the time of their capture." Gherebi, 609 F. Supp. 2d at 70-71.  The opinion discussed the criteria relevant to determining whether detention in a specific case complies with the laws of war.  Id. at 68-70; see also infra at Section IV.

In Hamlily v. Obama, 616 F. Supp. 2d 63 (D.D.C. 2009), Judge John Bates of this District Court concluded that, under the laws of war, the Government has the authority to detain individuals who were "part of . . . Taliban or al[-]Qaida forces," or associated forces.  Id. at 74.  The court went on to rule that the Government does not have the authority to detain those who are merely "substantial supporters" of those groups.  Id. at 76.  While the Court has great regard for the scholarship and analysis contained in both decisions, the Court concludes that Judge Walton's opinion presented a clearer approach, and therefore will adopt his reasoning and conclusion.[1]

---

[1]    The Court agrees with Judge Bates' comment that the determination under Judge Walton's approach of who was a "part of" al-Qaida and/or the Taliban, rests on a highly individualized and case-specific inquiry; as a result, the "concept [of substantial support] may play a role under the functional test used to determine who is 'part of' a covered organization," and the difference in the two approaches "should not be great." Hamlily, 616 F. Supp. 2d at 76.

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

## III. ANALYSIS

### A.   Evidentiary Presumptions

As a preliminary matter, some attention must be given to the nature of the evidence that has been presented in this case, and how the Court, as fact-finder, will go about evaluating that evidence. In attempting to meet its burden, the Government has provided evidence in the form of classified intelligence and interview reports that it believes justify the Petitioner's detention. The reports contain the statements of Petitioner, as well as statements made by other detainees, that the Government argues demonstrate the Petitioner's status as a member or substantial supporter of al-Qaida and/or the Taliban.

The Government requested that a rebuttable presumption of authenticity be granted to all the exhibits it intends to introduce.[2]   Gov's Mem. Regarding Presumptions, Hearsay and Reliability of Intelligence Information at 2 ("Gov Presumptions Mem.") [Dkt. No. 171]. Given the Government's representations that the specific documents included in its case against Petitioner, as well as the documents provided to Petitioner's counsel in

---

[2]    Ordinarily, "the requirement of authentication requires that the proponent, who is offering a writing into evidence as an exhibit, produce evidence sufficient to support a finding that the writing is what the proponent claims it to be."   2 K. Broun, McCormick on Evidence § 221 (6th ed.).

~~SECRET~~

-10-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

discovery, have all been maintained in the ordinary course of business, id. at 4-5, the Court will presume, pursuant to Fed. R. Evid. 803(6), that its documents are authentic. As provided for in the Case Management Order, the Government's exhibits will be granted a rebuttable presumption of authenticity and will be deemed authentic in the absence of any rebuttal evidence to the contrary.

The Government has also requested that a rebuttable presumption of accuracy be granted to all the exhibits it intends to introduce. Id. at 2. Petitioner takes issue with the reliability of the evidence offered by the Government. Pet. Farhi Saeed Bin Mohammed's Mot. For J. On the Record at 11-21 ("Pet.'s Mot.") [Dkt. No. 217]. The Government's request is denied for several reasons.

First, there is absolutely no reason for this Court to presume that the facts contained in the Government's exhibits are accurate. Given the extensive briefing and oral argument presented by counsel during the discovery phase of this case, as well as the exhibits submitted at the Merits Hearing, it is clear that the accuracy of much of the factual material contained in those exhibits is hotly contested for a host of different reasons ranging from the fact that it contains second-level hearsay to allegations that it was obtained by torture to the fact that no statement purports to be a verbatim account of what was said.

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Second, given the fact that this is a bench trial, the Court must, in any event, make the final judgment as to the reliability of these documents, the weight to be given to them, and their accuracy. Cf. Parhat v. Gates, 532 F.3d 834, 848 (D.C. Cir. 2008) ("[The Court] must be able to assess the reliability of the evidence [for itself].").[3] Those final judgments will be based on a long, non-exclusive list of factors that any neutral fact-finder must consider, such as: consistency or inconsistency with other evidence, conditions under which the exhibit and statements contained in it were obtained, accuracy of translation and transcription, personal knowledge of declarant about the matters testified to, levels of hearsay, recantations, etc.[4] See Hamlily v. Obama, Civ. No. 05-763 at 4-7 (D.D.C. Aug. 21, 2009) (order discussing evidentiary burdens); but see Bostan v. Obama, Civ. No. 05-883, 2009 WL 2516296, at *2 (D.D.C. Aug. 19, 2009).

Denial of the Government's request for a rebuttable

---

[3]     That Parhat came before the Court of Appeals in a different procedural posture does not undermine the principles it set forth regarding the need for the courts to assess the reliability of the Government's evidence. See Khan v. Obama, Civ. No. 08-1101, 2009 WL 2524587, at *2 n.2 (D.D.C. Aug. 18, 2009).

[4]     While the Supreme Court did suggest in Hamdi that a rebuttable presumption "in favor of the Government's evidence" might be permissible, 542 U.S. at 534, it did not mandate it.   In Boumediene, the Court clearly left it to the District Courts to craft appropriate procedures. Boumediene, 128 S. Ct. at 2272.

SECRET

-12-

SECRET

presumption of accuracy does not mean, however, that the Government must present direct testimony from every source, or that it must offer a preliminary document-by-document foundation for admissibility of each exhibit. As the Supreme Court noted in Hamdi, 542 U.S. at 533-34, hearsay may be appropriately admitted in these cases because of the exigencies of the circumstances.

Finally, while parties always retain the right to challenge the admissibility of evidence, the Court will be guided by the Federal Rules of Evidence, in particular Rule 402, providing that "[a]ll relevant evidence is admissible." Once all evidence is admitted into the record, the Court will then, in its role as fact-finder, evaluate it for credibility, reliability, and accuracy in the manner described above.

### B. Mosaic Theory

The Government advances several categories of allegations which, in its view, demonstrate that the Petitioner was detained lawfully. Above all, its theory is that each of these allegations--and even the individual pieces of evidence supporting these allegations--should not be examined in isolation. Rather, "[t]he probity of any single piece of evidence should be evaluated based on the evidence as a whole" to determine whether, when considered "as a whole," the evidence supporting these allegations comes together to support a conclusion that shows the Petitioner to be

SECRET
-13-

SECRET

justifiably detained. Gov's Mot. For J. Upon the Administrative R. and Mem. in Supp. at 6 (internal citation omitted) ("Gov's Mot.") [Dkt. No. 215]. While the Government avoids an explicit adoption of the mosaic theory, it is, as a practical matter, arguing for its application to the evidence in this case. Cf. Ali Ahmed v. Obama, 613 F. Supp. 2d 51, 55-56 (D.D.C. 2009).

The Court understands from the Government's declarations, and from case law,[5] that use of this approach is a common and well-established mode of analysis in the intelligence community. This may well be true. Nonetheless, at this point in this long, drawn-out litigation the Court's obligation is to make findings of fact and conclusions of law which satisfy appropriate and relevant legal standards as to whether the Government has proven by a preponderance of the evidence that the Petitioner is justifiably detained. The kind and amount of evidence which satisfies the intelligence community in reaching final conclusions about the value of information it obtains may be very different from, and certainly cannot determine, this Court's ruling.

Even using the Government's theoretical model of a mosaic, it

---

[5]    See, e.g., McGehee v. Casey, 718 F.2d 1137, 1149 (D.C. Cir. 1983) (recognizing that the "mosaic-like nature of intelligence gathering" requires taking a "broad view" in order to contextualize information) (internal citations and quotations omitted).

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

must be acknowledged that the mosaic theory is only as persuasive
as the tiles which compose it and the glue which binds them
together--just as a brick wall is only as strong as the individual
bricks which support it and the cement that keeps the bricks in
place. Therefore, if the individual pieces of a mosaic are
inherently flawed or do not fit together, then the mosaic will
split apart, just as the brick wall will collapse.[6]

A final point must be kept in mind. One consequence of using
intelligence reports and summaries in lieu of direct evidence is
that certain questions simply cannot be answered, i.e., there are
no witnesses to cross-examine or deposition transcripts to consult.
Sizeable gaps may appear in the record and may well remain
unfilled; each party will attempt to account for these deficiencies
by positing what they think are the most compelling logical
inferences to be drawn from the existing evidence. Accordingly,
that evidence which does exist must be weighed and evaluated as to
its strength, its reliability, and the degree to which it is
corroborated. In any event, the Government always bears the
ultimate burden of showing by a preponderance of the evidence that

---

[6]    Lest there be any confusion on this point, the Court
wishes to make clear that it does examine "the evidence as a whole"
and does try to contextualize it, given the limited perspective
that the facts of any individual case offer. Having said that, the
individual tiles must still be strong enough to keep the entire
mosaic from falling apart.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Petitioner's detention is lawful.  Just as a criminal defendant need not prove his innocence, a detainee need not prove that he was acting innocently.  In sum, the fact that the Petitioner may not be able to offer air-tight answers to every factual question posed by the Government does not relieve the Government of its obligation to satisfy its burden of proof.

C.    **Government Allegations**

Before trial, the substantive factual areas in dispute were narrowed down to (1) Petitioner's use of an alias or false name prior to and after his detention at Guantanamo Bay, (2) Petitioner's use of a false passport, (3) Petitioner's attendance at two mosques in London, (4) the role of terrorist networks in recruiting Petitioner and facilitating his travel to Pakistan and Afghanistan; (5) Petitioner's stay at an Algerian guesthouse in Pakistan, (6) whether or not Petitioner trained at a terrorist camp, and (7) whether or not Petitioner participated in battle.

According to the Government, the record demonstrates that Petitioner traveled, trained, and fought on behalf of al-Qaida and/or the Taliban, and his cover story to the contrary must be rejected as too incredible to be true.

Petitioner denies having any connection to terrorist groups. He insists that he fled Algeria due to family problems and in

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

search of economic opportunities in Europe.    <u>See</u> JE 17[7] at 1
(reporting Petitioner's explanation of his background).  He lived
in France and Italy as an undocumented alien for several years
before traveling to the United Kingdom in 2001.    <u>Id.</u>; Pet.'s
Traverse in Support of Pet. for Habeas Corpus at 37 ("Traverse").
While in Europe, Petitioner claims he attended mosques and met
people who suggested that he go to Afghanistan to find a particular
Swedish woman known to Rahim (a recruiter) who would be willing to
marry him so that he could obtain citizenship to stay in Europe.
JE 15 at 4; JE 17 at 2-3.  The Court will now examine the evidence
relating to each of the factual areas in dispute.

### 1.  Use of False Names and Documents

The Government claims that Mohammed had a history of using
false names and a false passport.  It points to instances in the
record where Petitioner, both during his time in Europe before
arriving in the United Kingdom and during his time in United States
custody in Pakistan and at Guantanamo Bay, reported that his name
was "Abdullah" or misrepresented where he was from.  JE 15 at 5
(telling American interviewers that he was French); JE 53 at 10
(same); JE 16 at 1 (reporting that Petitioner told Pakistani

---

[7]     Parties submitted a volume of Joint Exhibits, which
comprises the vast majority of evidence presented during trial.
Unless otherwise indicated, citations to "JE" refer to the universe
of Joint Exhibits.

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

authorities that he went by "Abdullah"). Additionally, Petitioner

purchased a stolen passport while living in Italy. JE 15 at 2.

The name on the passport was Oliver Jean Christian Marie Joseph

Bayart. Id. Mohammed used the name Bayart, in addition to

Abdullah, when being interviewed by American and Pakistani

authorities. JE 53 at 10; JE 16 at 1. The record establishes that

Mohammed used this false name and passport when entering the United

Kingdom. JE 15 at 3. He also relied on this information when he

traveled from London to Pakistan in 2001. Id. at 4.

Petitioner has little to say in refutation of these facts.

The dispute lies in the inferences that parties ask the Court to

draw from the facts. See Traverse at 35-36; 53-54. Petitioner

insists that "Abdullah" is a kunya, an honorific name commonly used

among people in Middle Eastern cultures. Id. at 35-36. He also

argues that the use of false names and documents was essential for

him to survive as an undocumented alien trying to find work and a

home in Europe. See id. at 37; see also Pet.'s Mot. at 18-19

(explaining Mohammed's intentions to elude immigration authorities

and find work in Europe). When considered in this light,

Petitioner argues that his use of "Abdullah" and the Bayart

passport were not related to any alleged terrorist activity.

The Government maintains that the false names and passports

demonstrate that Petitioner is a deceitful person who was

SECRET

-18-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

accustomed to misrepresenting himself to authorities.  In addition, while there is nothing inherently incriminating about using a kunya, the Government argues that these names are common among terrorists, who use them to hide their true identities. See JE 11. Further, Petitioner's admission of adopting "Abdullah" as a kunya corroborates other witnesses' identification of Petitioner by that name.  Gov's Mot. at 28-29.

Given that in the years before the attacks of September 11, Petitioner had regularly used false names and passports in order to avoid detection while he attempted to live and work in Europe without legal status, it is doubtful that the fact that he engaged in such conduct after September 11 proves anything regarding his support of al-Qaida.   See, e.g., JE 15 at 1-2 (explaining how Petitioner went from Algeria to France to Italy while evading authorities and working odd jobs).  For this reason, Petitioner's conduct with respect to false names and documents is not alone sufficient to justify his detention.   However, this conduct certainly demonstrates his willingness and ability to lie to the authorities and evade compliance with the law when it suited his purposes.  For this reason, the Court will consider this evidence's significance in light of other allegations as the remaining points in the Government's case are analyzed.

SECRET
-19-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

## 2. Attendance at London Mosques

Like the evidence that Petitioner used a kunya at times and that he submitted false names and passports to authorities, there is little dispute about the fact that he attended certain mosques in London after arriving there in 2001. The record shows that Mohammed frequented the Baker Street Mosque, and also made visits to the Finsbury Park Mosque, during the several months that he lived in the United Kingdom. See JE 15 at 2-3 (reporting Petitioner's admission that he attended Finsbury Park six to seven times, and Baker Street frequently); see also JE 17 at 2 (same).

The significance of this attendance, from the Government's perspective, is that these particular mosques served as critical posts within an al-Qaida recruiting network. The Government argues that the Baker Street and Finsbury Park Mosques were important recruiting centers for young Muslims in the United Kingdom. JE 10 at 1; JE 48 at 6; JE 52 at 7 (New York State Office of Homeland Security report referring to Finsbury Park Mosque as "a key jihadi breeding ground"); JE 23 at 3 (describing third-party detainee's comments that Finsbury Park was recruiting center for jihadists).

In 2003, according to a Defense Intelligence Agency declaration about the Finsbury Park Mosque, British security services raided the site and then shut it down after finding links to terrorist activity. JE 10 at 1; JE 48 at 6. The declaration

SECRET

-20-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

also states that several well-known terrorists with al-Qaida links attended Finsbury Park Mosque, including attempted shoe-bomber Richard Reid, convicted September 11 planner Zacarias Mossaoui, and participants in the July 2005 bombings in London. JE 10 at 1-2. A radical cleric at the Finsbury Park Mosque, Abu Hamza al-Masri (aka Mustafa Kemel) ("Hamza"), served as its imam. British authorities detained Hamza in 2004. JE 10 at 1; JE 48 at 6.

According to the Government, Mohammed's involvement in this world, in combination with his illegal entry into the United Kingdom and later activity in Afghanistan, is probative of his being part of or substantially supporting al-Qaida and/or the Taliban. Gov's Mot. at 10-11.

The Government points to evidence that Mohammed frequented the mosques. See JE 15 at 2-3; see also JE 17 at 2; JE 46 at 5. Petitioner, according to an intelligence report summarizing his statements, had become a more devout follower of Islam during his years in Italy before 2001. JE 15 at 2. Although Mohammed denies having any relationship with Hamza, the record does show that Petitioner was familiar with the cleric and heard him speak on at least one occasion. JE 15 at 3 (reporting that Petitioner told interviewers, "Hamza talked about how he lost his arms fighting [j]ihad"); see also JE 44 at 3; JE 33 at 3 (indicating that Mohammed claimed that he saw Hamza only once); JE 17 at 2 (same).

SECRET

-21-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Perhaps most importantly, the Government argues, Petitioner's attendance at these mosques provided entry to the terrorist network that eventually helped him fly to Pakistan and enter Afghanistan. Gov's Mot. at 10-11. Through his affiliation with Finsbury Park Mosque shortly after his arrival in London, Mohammed met and was befriended by Abdul Rahim. JE 15 at 4; JE 17 at 2. As discussed below, Rahim allegedly was a recruiter for al-Qaida, Gov's Mot. at 13, and was unquestionably instrumental in arranging Mohammed's travel to Pakistan and Afghanistan. JE 17 at 3; see also Pet.'s Opp'n at 18 (suggesting Rahim gave Mohammed a "glimmer of hope" in suggesting that he travel to Afghanistan).

Petitioner offers a different interpretation of these facts. The mosques, according to his account, were simply centers of worship and community for him. Traverse at 37-39. He attended Finsbury Park Mosque "about six to seven times total while he was in London," JE 17 at 2, and then became a "frequent[]" visitor to the Baker Street Mosque for the remaining few months he spent in London, JE 15 at 3. Petitioner explained to interrogators that Baker Street Mosque served cheap food to attendees, which was important for a man of Mohammed's limited economic means. JE 47 at 3 (reporting that Mohammed testified before the ARB that he "would eat at [the Baker Street Mosque] because the food was cheap"). He maintains that he did not seek out the mosques because they

SECRET

-22-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

supported radical political positions; rather, as a new arrival in
the country, he was directed to the Finsbury Park area, where he
found living accommodations and a mosque.  Id. at 3; JE 37 at 2.
According to Government intelligence reports, he told interviewers
that he had no interest in the mosques' militant teachings, did not
watch extremist lectures and videos about jihad, and was generally
ignorant of the mosques' status in any terrorist network.  JE 44 at
4; see also JE 46 at 2 (quoting Petitioner as telling the ARB,
"[t]here was no sign on the mosque that said extremist mosque").

As with the evidence regarding false names and documents,
details about Mohammed's mosque attendance are not alone sufficient
to justify detention in this case.  However, the evidence on this
point may indeed be probative of his ties to terrorist groups when
considered in conjunction with the more serious charges, as
discussed below, which represent the bulk of the Government's case
against Petitioner.  Only after analyzing the entire record can the
Court determine whether the inferences that the Government draws
from these facts are well-founded and make it more likely than not
that Petitioner was a member and/or substantial supporter of al-
Qaida and/or the Taliban.

### 3.   Recruitment and Travel to Afghanistan

Based on the record, it is clear that Rahim--the friend whom
Mohammed met through the Finsbury Park Mosque--conceived, planned,

SECRET
-23-

SECRET

and funded Petitioner's trip to Afghanistan. JE 15 at 4 (stating that Petitioner said Rahim directed him to meet a man named Mohammed when he arrived in Pakistan); JE 17 at 2-3. The route laid out for Mohammed took him first to Pakistan in June of 2001, and ultimately across the border into Afghanistan to the city of Jalalabad. Petitioner does not take issue with these facts; instead, he insists that he undertook this travel in the hopes of tracking down the Swedish woman who was willing to marry him so that he could obtain citizenship and remain in Europe. Pet.'s Opp'n at 18-19. Rahim had told him about the woman, about whom no name or other details are ever provided in the record. Mohammed had never met the woman and did not know her name.   Id.   The Government argues that this explanation is implausible, and is designed to cast Petitioner's prior activity in a better light as well as hide his actual terrorist ties that took him from London to training camps in Afghanistan. Gov's Mot. at 13; 30-34.

Rahim, as the Government points out, exercised a high degree of control over Petitioner's trip. Rahim initiated the idea of Petitioner traveling to Afghanistan, then helped him acquire a visa to enter Pakistan, and paid for his one-way ticket. JE 15 at 4. Petitioner used his fake Bayart passport to enter Pakistan, and carried with him 250 British pounds.   Id.

Rahim told Petitioner to seek out a Moroccan man named

SECRET
-24-

SECRET

Mohammed once he arrived in Islamabad, which he then did.  Id.; JE
17 at 3.  While Petitioner later provided a physical description of
Mohammed to interrogators, he knew nothing more about his contact's
background.  JE 17 at 3.  Petitioner stayed in Islamabad for one
week before Mohammed paid for Petitioner to take a taxi to
Peshawar, a city closer to the eastern border of Afghanistan.  Id.;
JE 15 at 4.  Petitioner paid Mohammed sixty British pounds for his
services.  The two then went to the house of a man named Abdul
Rahman.  Petitioner and Rahman drove Mohammad back to Islamabad,
and then set off for a village near the Afghanistan border.  Id.
At that village, Petitioner and Rahman stayed with a friend of
Rahman's for a few days, and then Rahman arranged for their travel
into Afghanistan.

Accounts vary in minor details, but it is clear from
intelligence reports that Rahman purchased a 4x4 Mazda truck
capable of negotiating mountainous terrain, and drove toward the
Afghanistan border.  JE 15 at 4; JE 17 at 3 (indicating the Rahman,
Petitioner, and Rahman's driver headed into the mountains).  Once
the road become unnavigable by truck, Rahman and Petitioner
proceeded on foot.  The two crossed the border into Afghanistan
without showing passports or visas to anyone.  Id.  Once inside
Afghanistan, Petitioner and Rahman took a taxi to Jalalabad.
Petitioner told interrogators that "[Petitioner] could not explain

Case 1:05-cv-01347-GK  Document 253  Filed 12/16/09  Page 26 of 81
UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

why Rahman was willing to do this." JE 17 at 3. In Jalalabad, the two travelers headed to the Arab quarter of the city, where they ended their journey at the Algerian guesthouse, run by a man named Abdul Hafiz. Id.; JE 15 at 4. Petitioner paid Rahman fifty British pounds, and Rahman returned to Pakistan. JE 15 at 4.

Petitioner's self-proclaimed ignorance of who was helping him, and why they were, at each stage of his travel, in combination with his handlers' obvious familiarity with shepherding individuals from Pakistan to Afghanistan, establishes that Petitioner's travel was indeed facilitated at each turn by someone with access to a network of contacts in the region.

The Government attempts to demonstrate that this was a terrorist network, and does so in part by presenting evidence that the route Mohammed took to the Jalalabad guesthouse was one well-trodden by other al-Qaida recruits from London. See Gov's Mot. at 14-17 (describing details of other detainees' recruitment and travel).[8] Based on this evidence, the Government argues that the

---

[8]     For instance, Abdenour Sameur (ISN 659), who at one point admitted to training at Al Farouq, followed a very similar path to Afghanistan. JE 23 at 2 (detailing layout and personnel at camp); but see JE 24 at 3 (denying that he was ever at Al Farouq). Sameur, like Petitioner, is an Algerian who moved from Italy to London. Once there, he too attended Finsbury Park Mosque. A man whom he also met through that mosque, Towfiq, recruited him to travel to Afghanistan. Towfiq sent Sameur to Islamabad first, where he was instructed to meet with a man named Mohammed. Mohammed also took Sameur to the Algerian guesthouse in Jalalabad,

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

most sensible inference to draw is that Petitioner was being moved
along a terrorist pipeline that led naturally from his recruitment
at radical London mosques to his participation in training and
battle. It is simply unbelievable, in the Government's view, that
he was being shepherded from person to person and country to
country in search of an unnamed and unknown Swedish bride whose
name he did not even know. Nor is there any evidence in the record
that Petitioner had ever been to Sweden or knew a word of Swedish.
Mohammed admitted to interrogators that Rahman knew nothing about
the woman, JE 15 at 4, suggesting that his handlers were not simply
friendly locals who were eager to help Mohammed in pursuing a wife.

Petitioner, again, does not deny either the particular route
that the Government describes, or that Rahim facilitated his travel
from London to Pakistan and then to Afghanistan. Rather, he
explains his travel to Afghanistan as part of his desperate attempt
to meet this unnamed Swedish woman and arrange a marriage that
would allow him to claim European citizenship. Mohammed explains
that ever since leaving Algeria, he had to struggle to find work

_____

which was run by Abu Jaffar. From there, Sameur went on to Al
Farouq. JE 23 at 2; see also JE 38 (travel of Ahmed Bin Saleh (ISN
290)); Gov's Mot. at 14, 16 (detailing similar stories of Binyam
Ahmed Mohammed (ISN 1458) and Sulimane Hadj Abderrahmane (ISN
323)). According to records of the statements that Sayab Mutij
Sadiz Ahman (ISN 288) ("Sayab") made to interrogators, Abu Jaffar
was in charge of this Algerian guesthouse, and Hafiz was his second
in command. JE 31 at 2.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

and avoid immigration authorities in Europe. He traveled to the United Kingdom looking for employment, and met a man who gave him hope--however distant--that there was a way for him to remain in Europe and avoid being forced back into a "dire" personal and economic situation in Algeria. Pet.'s Opp'n at 17-19.

The Court cannot, and does not, credit the Petitioner's reasons for wanting to go to Afghanistan. They are patently fantastic. While it is not his burden to demonstrate why he traveled to Afghanistan, when he does offer an explanation that is so unbelievable, and the Government provides credible support for its interpretation of Petitioner's motivation, the Court must choose between the two. See Hamdi, 542 U.S. at 534 ("[O]nce the Government puts forth credible evidence that the habeas petitioner meets the . . . criteria [for detention], the onus . . . shift[s] to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria."). In this instance, the Court fully credits the Government's argument that Petitioner was recruited and traveled via a terrorist pipeline.

### 4.  Guesthouse Stay

Petitioner admits that after being led into Afghanistan by Rahman, he stayed at Hafiz' guesthouse in Jalalabad.[9] See, e.g.,

---

[9]    Source documents provide different spellings of Hafiz' name.  However, based on context and the overwhelming phonetic

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

JE 68 at 1.   The Government argues that this guesthouse was associated with al-Qaida, and was run by Hafiz in conjunction with Abu Jaffar al-Jazeeri ("Jaffar") to facilitate the transfer of recruits to training camps in the region.   Gov's Mot. at 17-19. Petitioner counters that the record does not clearly demonstrate that he stayed at any guesthouse associated with al-Qaida, and that there is no reliable evidence that he used the guesthouse as a way station for a trip to al-Qaida and/or Taliban training camps. Traverse at 43-44.

The record establishes that Rahman guided Mohammed to Hafiz' guesthouse in Jalalabad.   JE 17 at 3; JE 15 at 4;   see also JE 21 at 1 (interrogation report of Mourad Benchelalli (ISN 161) stating that he saw Petitioner at guesthouse in August of 2001 before going off to train and then returning to house).   According to statements that Petitioner himself gave the Government, Hafiz ran the "Algerian guesthouse" in that city.   JE 15 at 4.   Mohammed did not pay for food during his stay at the guesthouse, but did pay Hafiz twenty British pounds upon departing.   JE 17 at 3.   Mohammed stayed at the house twice, initially for two weeks and then for another three weeks after traveling within Afghanistan for about one month.

_____

similarity of each version of the name, the Court finds that the documents are all referring to a man who operated a house where Petitioner stayed while in Jalalabad.

SECRET

-29-

SECRET

JE 15 at 5.[10]

The Government argues that the Hafiz house at which Petitioner admittedly stayed is in fact the same guesthouse that Jaffar ran to support al-Qaida recruitment efforts, and it supports its case by pointing to the statements of other detainees familiar with the Jalalabad facility.

For instance, Sameur reported to interrogators that he stayed at a guesthouse for Algerians in Jalalabad. JE 23 at 2. He claimed that "Abu Jafair" was in charge there, and that Hafiz "was responsible for holding everyone's personal items." Id.; see also JE 41 at 5 (reporting that during interrogation of ISN 371, detainee stated that Hafiz and Jaffar were at guesthouse during time of his training). Sayab, an Algerian, also told interrogators that he stayed at the Algerian guesthouse in Jalalabad. JE 13 at 3; JE 31 at 2. He identified Hafiz as "second in command when [Jaffar] was gone." JE 31 at 2; see also JE 13 at 3 ("Second in command of the safehouse was Abdul Hafiz."). In Sayab's 2005 account, there were "7 sometimes eight people in the Algerian guesthouse in Jalalabad" when he was there. JE 31 at 2. The accounts are detailed, and were recorded as part of Government

---

[10]    See also JE 17 at 3-4 (stating that Petitioner stayed at guesthouse twice, but not specifying length of stays); but see JE 68 at 1 (declaration from Petitioner claiming he was at Hafiz' house for "about a month," but making no mention of second visit).

SECRET

-30-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

intelligence reports that were created in the regular course of business. The Court credits them as reliable.

Having pointed to evidence that demonstrates Hafiz' house was the same facility as the guesthouse that Jaffar operated, the Government argues that Jaffar's house "provided lodging to jihadist recruits who were headed to various al-Qaida associated training camps."[11]   Gov's Mot. at 17.

The Government points out, first, that Suliman Abdul Rahman (ISN 323) ("Suliman") told interrogators that Jaffar acted as "the primary point of contact for all Algerians sent to [Afghanistan]" as part of an al-Qaida and/or Taliban network.[12]   JE 35 at 2. Second, Suliman provided detailed descriptions of Jaffar, and discussed Jaffar's participation in an al-Qaida pipeline that ran from London mosques to training camps in Afghanistan.   Id.   "Field comments" in Suliman's intelligence report state that Jaffar "was able to have Algerians and other non-Afghanis transported by the Taliban to his safehouses, and trained at al Qaida camps."   Id. Suliman told interrogators that Jaffar arranged for him to be admitted to ████████████████████████████████   Id.; see

---

[11]   As discussed below, the Government also links Jaffar to fighting in the Tora Bora region.

[12]   Neither party argues that this detainee is the same Rahman who led Petitioner across the border into Afghanistan.

SECRET

-31-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

<u>also</u> JE 7 at 2 (reporting significance of Al Farouq). Third, Sameur, a detainee who attended Finsbury Park Mosque and traveled to the guesthouse, said that funds raised at the mosque went to Jaffar to run the guesthouse. JE 40 at 7-8. He also told interrogators that occupants of the guesthouse were "encouraged to attend training in one of the camps," but not "pressured" to do so. <u>Id.</u> at 8.

In yet another account, a detainee whom the Government report identifies only as ISN 558 stated that he knew Jaffar as the "emir of the Algerians in Afghanistan," a man who was "responsible for getting trainees to the Khalden Training Camp." JE 42 at 3. Although the Government admits that Khalden was "operationally and organizationally independent of al-Qaida," Gov's Mot. at 18 n.18,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

<u>Id.</u> (citing Defense Intelligence Agency Background Declaration – Terrorist Training Camps (JE 7 at 8)).

There is additional evidence that men who stayed at the Algerian Guesthouse went on to train. <u>See</u> JE 21 at 1; PE 2 at 2-3. In the case of Nizar Sassi (ISN 325), he left the Algerian house in Jalalabad for the Algerian house in Kabul. There he met a man named "Abou ((Djafar))" who informed the group that training in one camp had finished and that they would have to await the opening of

SECRET
-32-

SECRET

a new camp or go to another training location. Djafar coordinated Nizar's trip to Al Farouq. PE 2 at 2-3.

Finally, Binyam Mohamed is reported to have given interrogators information that suggests the Algerian guesthouse was involved in terrorist activities. While detained at Guantanamo Bay, he stated that Jaffar informed guesthouse occupants that Bin Laden had called for the closing of all but two of the training camps. As a result, Binyam Mohamed and other recruits dismantled the camp at which they were training, loaded weapons into a vehicle, and drove them to "the Algerian guesthouse in Jalalabad where they were stored in a concrete safe located in the back of the guesthouse compound." JE 36 at 6.[13] Another detainee, Sameur, also linked the house to weapons, claiming that he was "assigned a Kalishnikov [sic] while there." JE 24 at 3; but see JE 13 at 3 (reporting that Sayab told interrogators "there were no weapons at the safehouse").

Petitioner challenges the Government's claim that Hafiz and Jaffar operated the same facility in Jalalabad, and also challenges the related suggestion that his stay with Hafiz suggests terrorist activity on his part. He also takes issue with the use of any statements made by Binyam Mohamed.

---

[13]     See infra at note 15.

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Petitioner claims that only he and Hafiz stayed in the Jalalabad house. JE 68 at 1. There is no mention in his 2009 declaration of other guests at the house; in fact, for much of the month that he stayed there, according to Mohammed, he was there alone because "Hafi[z] was often away." Id. In Petitioner's other accounts of his time at the guesthouse, Jaffar is never mentioned. See JE 15 at 5; JE 17 at 2-3. He argues that other detainees' accounts of the guesthouse do not mention Petitioner's presence there, except for Benchalalli. See JE 21 at 1. That account, Mohammed contends, simply cannot be credited because Benchelalli was there in August of 2001, at a time when Petitioner was allegedly off at training. Further, Mohammed points to evidence in the record that suggests that it was not uncommon for guests at Hafiz' house to encounter few, if any, other people there. PE 2 at 2. This intelligence report describes the guesthouse as a "villa," suggesting that it is at least theoretically possible that the facility was made up of several different buildings and therefore it was possible for one guest to not have any interaction with other guests. Id.; see also JE 21 at 1 (describing "safehouse" as "large structure that was very divided").

Petitioner's account of his stay at the guesthouse and his argument that he had no interaction with others in the guesthouse suffer from a number of weaknesses. First, his declaration claims

SECRET
-34-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

that he stayed alone with Hafiz for a month, was joined there by a man named "Muthaina," went to Kabul with him, and then returned to Jalalabad for one month after the events of September 11. JE 68 at 1-2. He makes no mention of the guesthouse during his second stay in Jalalabad. However, in earlier statements made to interrogators, Mohammed admitted to staying at the guesthouse twice, both before and after his trips to Kabul. JE 15 at 4-5 (returning to Algerian guesthouse after little over month in Kabul); JE 17 at 3-4 (same). The declaration does not explain whether he returned to the guesthouse, as he claimed he did earlier. In sum, Petitioner has given inconsistent statements.

Second, in his earlier account of his travels, Petitioner admitted that he saw others at Hafiz' house. He reportedly told interrogators that "Nouradin . . ., an Algerian" was "one of the occupants of the Algerian guesthouse." JE 15 at 5. According to an interrogation in October of 2002, Nouradin arrived at the house during Mohammed's second stay there. JE 17 at 4. Mohammed must have been there with at least one additional person as well, because he stated that he also lived with Muthaina, another Algerian man. JE 15 at 5; JE 17 at 3 ("Farhi met and lived with Mothana . . . at Abdel Hafeez' house.");[14] JE 68 at 2 (declaring

---

[14]    Based on context and the overwhelming phonetic similarity of each version of Muthaina, the Court finds that the same person

SECRET
-35-

SECRET

that Muthaina came to Hafiz' house). These admissions are inconsistent with his claim that he lived alone at Hafiz' house, and therefore bolster the Government's evidence that he was part of the general population of men staying at the Algerian guesthouse.

Despite Petitioner's speculation about the existence of more than one Algerian guesthouse in Jalalabad, the evidence in the record shows that he stayed at the same facility that at various points accommodated groups of men who then went on to train. Critically, there is evidence that Petitioner's claim that he stayed there alone is not accurate--others identified him as one of the group there, and Mohammed admitted to meeting others while staying there.

In sum, the Court finds that the Government has provided credible evidence that Mohammed arrived at the Jalalabad guesthouse as part of a recruiting network, and stayed with other individuals who went on to train with al-Qaida. [15] Petitioner attempts to discredit the Government's argument by claiming that all of his travel was undertaken to meet the unnamed, unknown Swedish woman

is being referred to.

[15] The Government has provided sufficient evidence on this point even without the contested statements made by Binyam Mohamed. Because his testimony is not necessary to prove the factual allegations regarding guesthouses, the Court will not address Petitioner's objections to his testimony in this section.

SECRET
-36-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

whom he would marry in order to obtain citizenship. Pet.'s Opp'n
at 18-19. Mohammed insists that this motivation was behind each
step of his journey, from his conversations with Rahim in London to
his willingness to follow strangers into Afghanistan when he
arrived in Islamabad. JE at 17. The Court has already rejected
this explanation in toto.

He maintains that his first transporter in Pakistan knew about
this Swedish woman, but reports that his second (Rahman) did not.
Further, he admits that when he got to Hafiz' house, he was
"embarrassed" to tell his host about the Swedish bride, and so
waited two weeks to do so. JE 15 at 4-5. When he did, Hafiz
allegedly told Mohammed that "she had just left Jalalabad," id.;
according to what Hafiz reportedly told Petitioner, the woman
"travels a lot." JE 17 at 3. As the Government persuasively
argues, this portion of "the Swedish woman" story is as incredible
as the portion discussed earlier.

Mohammed further explains that he followed the advice of a man
he had just met (Rahim) to fly from London--where he wanted to
ultimately settle--to Pakistan in pursuit of an unnamed Swedish
woman who may or may not have then agreed to marry him so that he
could obtain citizenship. He accepted the new friend's money in
order to do so. Along the way, he forged his passport, relied on
strangers' assistance, crossed illegally into Afghanistan, and

SECRET
-37-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

found himself in a city where he allegedly knew only one other person (Hafiz). He would then have us believe that he hesitated for two weeks in telling that one person the reason that he was in the city, even though the Swedish woman had been held out to interrogators and the Court as "the sole reason for his trip" and the reason for his "glimmer of hope that he could finally obtain those priceless residency papers."[16] JE 17 at 3; Pet.'s Opp'n at 18; see also JE 47 at 4.

Mohammed's stated reason for going to Afghanistan is entirely implausible. Further, he provides inconsistent accounts of his stay at the Jalalabad guesthouse. These findings undermine his attempts to defeat credible evidence put forth by the Government that Mohammed lived among al-Qaida supporters while there. The Government has established that it is more likely than not that he traveled there as part of a recruiting pipeline. Therefore, the Court credits the Government's evidence regarding Petitioner's

---

[16]    Though this argument is not fully articulated by Petitioner, the Court does not credit the position that Mohammed was simply being strung along by sophisticated recruiters who preyed on his naive wish to meet a bride. First, Mohammed never alleges that Rahim and his network were doing such a thing; instead he sticks to the story that he was waiting for the Swedish woman, even after being detained for allegedly supporting al-Qaida and/or the Taliban. See, e.g., JE 17 at 3 (deciding to wait in Jalalabad for Swedish woman to return from travels). Second, Rahman, his second transporter, did not know about the Swedish bride. JE 15 at 4. This suggests that it was not a concerted effort by recruiters to hide the truth from Petitioner.

SECRET

-38-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

earlier conduct, specifically mosque attendance and travel to Afghanistan with Rahim's assistance.

This Court has already ruled that guesthouse stay may not, in and of itself, provide an independent basis for detention. See Ali Ahmed, 613 F. Supp. 2d at 64-65 (finding that stay at a guesthouse, even among al-Qaida members, not sufficient to justify detention); classified op. at 35-39. However, that is not the issue in this case. Here, the Government has demonstrated that Petitioner stayed at a guesthouse with links to al-Qaida. It has also shown that he traveled to that location with the assistance of a network of individuals tied to al-Qaida, and that he was brought to this particular guesthouse by those men. Further, while his attendance at the two London mosques may not, in and of itself, demonstrate membership in or substantial support of al-Qaida and/or the Taliban at the time it took place, his subsequent conduct (both using the recruiters and and relying on their travel guides), when viewed along with his attendance at the mosques, does demonstrate that it is more likely than not that the time he spent at those mosques was the beginning of his journey toward affiliation with al-Qaida.

In sum, Petitioner's story about seeking a Swedish bride in Afghanistan does not meet his rebuttal burden. As the Court has noted earlier, "once the Government puts forth credible evidence that the habeas petitioner meets the . . . criteria [for

SECRET
-39-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

detention], the onus . . . shift[s] to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria." See Hamdi, 542 U.S. at 534. Petitioner has failed to provide persuasive evidence regarding his stay at the Algerian Guesthouse and the Government has met its burden by far more than a preponderance of the evidence. This finding does not end the inquiry.

### 5. Training

The Government argues that Petitioner left the Jalalabad guesthouse to train at an al-Qaida camp, and then returned to Jalalabad before fleeing the country for Pakistan after September 11. Gov's Mot. at 19-24. Its chief support for this argument consists of the statements of Binyam Mohamed, who told interrogators at Guantanamo Bay in October and November of 2004 that Petitioner attended a training camp with him. JE 27 at 1; JE 36 at 5; JE 34 at 2.



~~SECRET~~

-40-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



Petitioner contends that Binyam Mohamed's statements--the only other evidence placing Petitioner in a training camp--cannot be relied upon, because he suffered intense and sustained physical and psychological abuse while in American custody from 2002 to 2004. Petitioner argues that while Binyam Mohamed was detained at locations in Pakistan, Morocco, and Afghanistan, he was tortured

SECRET

-41-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

and forced to admit to a host of allegations, most of which he has since denied. When he arrived at Guantanamo Bay, Binyam Mohamed implicated Petitioner in training activities. Pet.'s Opp'n at 11-13. However, after being released from Guantanamo Bay, he signed a sworn declaration claiming that he never met Petitioner until they were both detained at Guantanamo Bay, thereby disavowing the statements he made at Guantanamo Bay about training with Petitioner. In that sworn declaration Binyam Mohamed stated that he was forced to make untrue statements about many detainees, including Petitioner. JE 60 at ¶¶ 2-6. Binyam Mohamed stated he made these statements because of "torture or coercion," id. at ¶ 8, that he was "fed a large amount of information" while in detention, and that he resorted to making up some stories. Id. at ¶ 5-6. The Government does not challenge Petitioner's evidence of Binyam Mohamed's abuse.

### a.   The Government's Evidence

The inculpatory statements that Binyam Mohamed made against Petitioner are contained in intelligence reports based on interrogations at Guantanamo Bay in October and November of 2004. See JE 27 (October 29, 2004, interrogation at Guantanamo Bay); JE 36 (November 5, 2004, interrogation at Guantanamo Bay); JE 34 (same). The Government argues that Special Agent 3 ███████████, who had interviewed Binyam Mohamed as early as July 21, 2004, at

SECRET
-42-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Bagram Air Base, developed a relationship with him that was non-abusive, and, in fact, cordial and cooperative. Gov's Opp'n at 16-18. It suggests that over time the two built a rapport that allowed the detainee to voluntarily provide accurate information. See JE 55 at ¶ 4 (stating that Special Agent █ created 18 interview reports based on many meetings with Binyam Mohamed). The Government stresses that it relies on these voluntary confessions given at Guantanamo Bay, and not any statements procured by earlier alleged mistreatment, in establishing its case against Petitioner. Gov's Opp'n at 15-16.

In support of its claim that Binyam Mohamed's statements at Guantanamo Bay were not coerced, the Government offers a signed and sworn declaration from Special Agent █ stating that the witness demonstrated a "polite and cooperative demeanor" at Bagram, JE 55 at ¶ 4; see also id. at ¶ 17 (describing Binyam Mohamed as "kind, polite, and relaxed"), and was "kind, polite, and relaxed throughout [their] meetings at Guantanamo," id. at 26. He states that the witness did not raise any allegation of torture during these meetings. Id. at ¶ 26.

The intelligence reports that the Government directly relies on to place Petitioner at a training camp are consistent with Special Agent █ characterization of the interrogations. On October 29, 2004, Binyam Mohamed was interrogated at Guantanamo

SECRET

Bay, just after he arrived there from being held in United States custody in Afghanistan. The report begins by describing various courtesies extended to the detainee, such as using a traditional Muslim greeting and offering him coffee. JE 27 at 1.[18] There was a brief exchange about Binyam Mohamed's health, and "[s]ubject detainee commented that he was doing well." Id. The meeting lasted for over two hours, was conducted in English, and was ▮▮▮▮▮▮▮▮

Id.

After this prologue, the report indicates that Binyam Mohamed was shown a total of 27 photographs of various individuals, and identified 12 of them. Id. at 2-4. He identified Petitioner by his kunya, "Abdullah," claiming that Petitioner "trained at the Algerian Camp with [him] and . . . eventually traveled to Kandahar with to [sic] [him]." Id. at 2. Special Agent ▮ notes at the end of his report that the subject was "very cooperative and

---

[18]    The report redacts the name of the interrogator. However, the Court infers for the following reasons that Special Agent ▮ conducted the interview and wrote the report. First the interrogator's employer in the report matches Special Agent ▮'s. Compare JE 27 at 1 to JE 55 at ¶ 1. Second, Special Agent ▮ testified in his declaration that he interviewed Binyam Mohamed on the date indicated on the report. JE 55 at ¶ 4 n.2. Finally, Special Agenct ▮ stated that he memorialized his interviews in intelligence reports after conducting them, JE 55 at ¶ 4, and the language in the report resembles closely that language used in the declaration.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

polite," and that he answered questions without betraying "signs of deception or resistance techniques." Further, Binyam Mohamed "at many times" spoke freely without being questioned or prompted, and the information that he provided was deemed to be consistent with earlier information that he provided, though it does not state where Binyam Mohamed provided the earlier information. Id. at 4.

On November 5, 2004, Binyam Mohamed again claimed that he trained with Petitioner. There are two reports in the record from that date. See JE 34 (Summary Interrogation Report ("SIR")); JE 36 (Intelligence Information Report ("IIR")). Special Agent ████ stated that he interviewed the witness on that date, JE 55 at ¶ 4 n.2, although neither report reveals the name of its author, nor of the interrogator. It may well be that Special Agent ████ wrote the report contained in JE 34, because its content matches his declaration's description of their November 5, 2004, meeting.[19]

In JE 34, Binyam Mohamed claimed that while at training, he was in a group with Abdullah and two other men. JE 34 at 2. According to the report, Binyam Mohamed "did not believe that Abdullah had any purpose" in undertaking the training; he did

---

[19]     Further, JE 34 is a SIR. The intelligence community creates these reports after the interrogation, and they contain all the details of the session. JE 1 at 7. Special Agent ████'s practice was to write reports directly after his interrogations of subjects. JE 55 at ¶ 4. It appears the he wrote JE 34 consistent with these practices.

SECRET
-45-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

comment on the motivations of the two other trainees.  Id. at 4.
During this session, Mohamed was "cooperative," but appeared
"apprehensive" at having not seen his lawyer.  Id. at 1.

The second report based on the November 5, 2004, interview is
contained in JE 36.  Binyam Mohamed provided extensive information
about his path to Afghanistan.  He stated that "another Algerian
from Italy, Abdullah[,] who was approximately 40-45 years old, came
with two other Moroccans to the camp only three to four days before
it closed."  JE 36 at 5.  A field comment indicates that Binyam
Mohamed had identified Abdullah as Petitioner.  Binyam Mohamed said
that Adbullah and two others (the same men described in another
intelligence report, JE 34 at 2) traveled back to Kandahar after
the close of the camp, along with a man named Elyas.  Id.  He
expanded on this account of the camp's closing, stating that Bin
Laden had ordered it to be shut down.  As a result, trainees tore
down the camp, packed up its weapons, and hauled them back to the
Algerian Guesthouse in Jalalabad, where they were stored in a
concrete safe in the yard.  The four men in Binyam Mohamed's
training group were then instructed that they would be sent on to
Al Farouq.  Id. at 6-7.  In a closing field comment, the report
notes that "the detainee answered all questions without
hesitation."  Id. at 7.

The Government maintains that these accounts are detailed and

SECRET
-46-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

consistent, and should be credited as accurate descriptions of Petitioner's training activity. The information is corroborated by that gathered from other Guantanamo Bay and Bagram sessions with Binyam Mohamed where he provided detailed and consistent accounts of his activity in London and Afghanistan, although Petitioner was not specifically discussed. See JE 25; JE 26. Further, the Government argues that Binyam Mohamed was treated well at Bagram and Guantanamo Bay, where he developed a rapport with Special Agent ▮▮▮▮▮▮▮ and provided reliable intelligence to investigators, including information that comprises the most serious allegations against Petitioner. Bolstering the Government's claims, Binyam Mohamed admitted after his release from detention that he did indeed receive training while in Afghanistan. GE 7 at 9; JE 65 at Daily Mail 10. This admission, according to the Government, makes it plausible that he could have seen other individuals, including Petitioner, while at the camp.

### b. Petitioner's Attacks on the Government's Evidence

The Government's claims of reliability are undermined by the sworn declaration of Binyam Mohamed that he was brutalized for years while in United States custody overseas at foreign facilities. He was then transferred to Guantanamo Bay, where he was further detained by the United States and where Government

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

personnel quickly resumed their interrogation of him, although no coercive measures were used. These later interrogations yielded the information that the Government relies on to support several allegations in this case, the most significant of which is that Petitioner trained with al-Qaida.

### i. Torture Allegations

Petitioner provides sworn declarations from Binyam Mohamed that indicate he was forced to make untrue confessions while being abused after United States authorities detained him overseas. JE 65 at 1 (declaring under penalty of perjury on June 9, 2009, that the attached accounts of his torture "are factually accurate and accurately describe his treatment"); JE 60 at ¶ 8 (declaring that he made false statements about himself and others because of the "torture or coercion [he] was undergoing").

In addition, Binyam Mohamed detailed his mistreatment in meetings with his attorney, Clive Stafford Smith, in August of 2005. Smith recorded his client's words in a memorandum that presents Binyam Mohamed's story chronologically, starting with his detention in Pakistan, following his rendition to Morocco for eighteen months, his transfer to the "Dark Prison"[20] in Kabul, his imprisonment at Bagram, and then his arrival at Guantanamo Bay.

SECRET

-48-

SECRET

See JE 65 at Mem. 1, 2, 4, 16, 19-20.  The narrative is at its most detailed in this memorandum, but has been repeated a number of times, in whole or in part, by Binyam Mohamed subsequent to his release from United States custody. See JE 65 at Daily Mail; JE 61 (collecting articles).  The remainder of this section presents the harrowing story that Binyam Mohamed has told about his abuse, as recounted in either Smith's memorandum or the diary he created for his lawyer in 2005, and repeated since his release from Guantanamo Bay.

He was initially detained while attempting to leave Karachi, Pakistan on April 10, 2002.  He was planning to return to London, where he had lived recently.  JE 65 at Mem. 2.  According to his account, the Pakistani authorities held him in prison, and gave the FBI access to him while there.  Four FBI interrogators conducted daily interviews between April 20 and 27, 2002.  Id.  Just weeks after his capture, his torture began.

The FBI questioned him about his activities, and, unsatisfied with his answers, threatened to transfer him to other countries where he would experience harsher treatment.  Then, the FBI agents would leave the room and Pakistanis entered.  They beat him with a leather strap, and staged a mock execution where a guard pointed a semi-automatic weapon at Binyam Mohamed's chest for several minutes, and stood over him motionless.  The guard relented, left

SECRET
-49-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

the room, and FBI personnel re-entered the room for further questioning. Id. at 2-3

Binyam Mohamed told his lawyer that on July 19, 2002, he was flown from Karachi to Islamabad. He was kept in a cell for the weekend. On July 21, he was taken to a military airport and turned over to United States authorities. Soldiers dressed in black and wearing masks stripped him, conducted a full-body search, and put him aboard a plane. He was shackled, blindfolded, and made to wear earphones. Id. at 4. The plane arrived in Morocco the next day, at a place that he believed to be near the city of Rabat.

At this point in Smith's memorandum, he transcribes undated entries from a "very rough preliminary edition of Binyam's diary of his torture." Id. at 4. According to that diary, Binyam Mohamed was told that the United States wanted a story from him, and that he had been linked to important figures in al-Qaida, including Khalid Sheikh Mohammed, Abu Zubaydah, Ibn Sheikh Al Libi, and Jose Padilla. Id. At the prison, which is described in great detail, he was confronted by several individuals, each of whom played a role in eliciting information from him. Id. at 5-6. He claims that the Americans wanted testimony from him to use in court proceedings. Id. at 6.

In the first week at the prison, he was questioned repeatedly, warned that he would experience torture if he did not cooperate,

SECRET

-50-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

and told that the British government knew of his situation and sanctioned his detention. Id. at 7-8. Throughout the narrative, Binyam Mohamed conveys dates, physical descriptions of guards and interrogators, details about his surroundings, and details about his treatment.

On August 6, his captors began to beat him. With hands cuffed behind his back, he was punched in the stomach many times, kicked in the thighs, and left on the floor, where he vomited and urinated on himself. Id. at 9. His entry for August 7 begins by stating, "[t]here was to be no more first[-]class treatment. No bathroom. No food for a while. . . . I was taken for interrogation." Id. The guards beat him, then demonstrated sympathy, and then resumed beatings. Id. at 10. While being beaten, he was fed information about himself and told to verify it. If he denied it, he was beaten; he would then confirm the information, and be ordered to provide more details about it. When he failed to provide more information, he was again beaten. After a week without any abuse, he was moved to a room in another location, and introduced to a man named "Marwan." Id.

Marwan told Binyam Mohamed to "give [him] the whole story over again," and when the witness faltered in repeating information, watched as three "goons" stepped in to beat him while he was tied to a wall. Id. He was left hanging from the wall for an hour.

SECRET

-51-

SECRET

The men returned and resumed beating Binyam Mohamed; they kicked his feet out from under him so that his arms were wrenched upward behind him.  They beat him throughout the night, and left him on the floor the next day.  Id. at 10-11.  He heard the screams of others outside his cell, and thought that they were either being raped or electrocuted; he was kept awake at night by these sounds. Id. at 11.

According to the diary, his Moroccan captors made it clear that they were working with the United States.  Id. at 11 (stating that Moroccans sided with "pissed off" Americans, and would do "whatever [the United States] wants").  Binyam Mohamed was told that he was suspected of being a "big man" in al-Qaida.  Binyam Mohamed stated that he was willing at this point to say whatever his captors wanted him to, which pleased Marwan.  Put off by his satisfaction, Binyam Mohamed mocked Marwan for being Moroccan and not having intelligence as the British do.  Id. at 11-12.

After this exchange, Marwan had Binyam Mohamed tied to a wall. Three men stripped him of his clothes with "some kind of doctor's scalpel."  The witness claims he feared rape, electrocution, or castration.  Id. at 12.  His captors cut one side of his chest with the scalpel, and then the other.  One of the men then "took [Binyam Mohamed's] penis in his hand and began to make cuts" with the scalpel as Marwan looked on.  Id. at 13.  They cut "all over [his]

SECRET
-52-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

private parts" while Binyam Mohamed screamed. He estimates that they cut him 20-30 times over two hours; "[t]here was blood all over." Id. He was given a cream from some doctors. This precise conduct continued about once per month for the 18 months that he was in Morocco. Id. at 12-13; 16 (describing "routine" cuttings and use of liquids to burn him). He reports that a guard told him that the purpose of the scalpel treatment was to "degrade" him, so that when he left, he'd "have these scars and [he'd] never forget. So [he'd] always fear doing anything but what the US wants." Id. at 13.

The captors coached Binyam Mohamed on what to say during interrogations, according to the diary. He was told that if he simply repeated in court the information being fed to him, then the torture would cease. Binyam Mohamed agreed to repeat what he was told. Id. at 14. He was told to say, among other things, that he met Bin Laden five or six times, that he advised him on places to attack, and that he had conferred with Bin Laden's deputies. Id.; but see JE 65 at Daily Mail 14 (claiming that he told interrogators he met Bin Laden thirty times). He was given names of people that he allegedly knew, and told to confess to being "an [a]l[-]Qaida operations man." JE 65 at Mem. 14.

He was moved again in September or October of 2002 to a new location in Morocco. His new quarters are described in his diary

SECRET

-53-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

in extreme detail, including a listing of the color of his sheets, the type of toothpaste he was given, and the brand of soap he was supplied. Id. For days on end, he remained handcuffed with earphones on, and loud music was blasted into his ears. This tactic, as well as others, interrupted his sleep for the whole time he was in Morocco. Id. at 14-15. This treatment, in Binyam Mohamed's account, was the beginning of a campaign of mental torture designed to break him. He claims that his captors put mind-altering substances in his food, forced him to listen to sounds from adult films, drugged him, and paraded naked and semi-naked woman around his cell. Id. at 15.

He wrote that the mental torture led to an "emotional breakdowns." Id. Throughout this period, he was subject to two or three interrogations per month. These sessions are described as being "more like trainings, training [him on] what to say." Id. at 16. He was deprived of all access to the outdoors. He met only interrogators and guards while in the Moroccan prison.

On January 21 or 22, 2004, Binyam Mohamed and two other prisoners were put on a plane with United States soldiers dressed similarly to those who had transferred him to Morocco from Pakistan. Id. at 16-17. Again they stripped him before transporting him. Binyam Mohamed recalls that one female soldier was assigned to take pictures of him. She expressed horror at the

SECRET

-54-

SECRET

scars on his penis. <u>Id.</u> at 17.

The diary reports that Binyam Mohamed was taken to the "Prison of Darkness" in Kabul. He describes the location of his cell, its proximity to the shower room, and its size ("2m by 2.5m"). Before being locked in that cell, his head was banged against a wall a few times "until [he] could feel blood." <u>Id.</u> He was given a thin blanket, and a bucket to use as a toilet. Binyam Mohamed was chained to the floor and then locked in complete darkness. He was "hung up" for two days,[21] deprived of sleep, and fed only once over that period. <u>Id.</u> at 17-18 (stating that his "wrists and hands had gone numb"). "After a while I felt pretty much dead," he wrote. <u>Id.</u> at 18.

Guards bombarded his cell with loud music ("Slim Shady and Dr. Dre" for 10 days) and scary sounds. He was fed inedible food and weighed every other day. Guards made noises to prevent prisoners from sleeping. There were infrequent showers and even less frequent changes of clothes. <u>Id.</u> He told a British newspaper in 2009 that he was shackled often, once for eight days on end in a position that prevented him from standing or sitting. JE 65 at Daily Mail 5. While undergoing this treatment, it appears that Binyam Mohamed attempted to be forthright with CIA interrogators

---

[21] This term is not explained. It may refer to the "hanging from the wall" described earlier.

SECRET

and renounce the story he had been coached to adopt. This resulted
in his "being chained to the rails for a fortnight." JE 65 at Mem.
at 18. He stated that he tried to tell the truth because "the CIA
interrogators looked understanding." Id. at 18.

He and another prisoner were interrogated regularly. Binyam
Mohamed says the sessions drove other detainees crazy. He heard
these detainees "knocking their heads against the walls and the
doors, screaming their heads off." Id. Binyam Mohamed maintains
that he was fed information about individuals in pictures. When he
tried to be compliant and provide made-up information about the
pictured men, his interrogator was initially happy, but then "did
[his] homework" and threatened to torture him further if he lied
again. They simply wanted him to repeat what they told him to
say. This included an admission of his involvement in a dirty bomb
plot. Id. at 19.

At first, his cell was dark for all but one hour per day.
Gradually, he was allowed more light, until it was dark for half of
the day. Similarly, showers were not allowed initially, but later
prisoners were permitted weekly bathing. Binyam Mohamed at first
received food once every 36 hours. After some weeks, that was
increased to twice per 36 hours, and by May of 2004, he received
tea and bread for breakfast. Eventually, he was given five minutes
per week to spend outside. Id. at 18-19.

SECRET

-56-

SECRET

In May, Binyam Mohamed and other prisoners boarded a
helicopter destined for Bagram Air Base. While there, he was
permitted to see the ICRC for the first time. Id. at 19-20.
According to Binyam Mohamed, the ICRC could not publish his story,
because they had an agreement with the United States to "keep
everything on the hush hush." Id. at 20. At Bagram, Special Agent
3 ▓▓▓▓▓ made him write out his narrative. Part of this story
repeated the lies that he was fed by his captors while in Morocco,
including the story about his involvement with the alleged "dirty
bomber," Jose Padilla. Id.

In October of 2008, the Government dropped allegations that
Binyam Mohamed was involved in any bomb plot. See Peter Finn, Key
Allegations Against Terror Suspect Withdrawn, Wash. Post, October
15, 2008, available at http://www.washingtonpost.com/wp-
dyn/content/article/2008/10/14/AR2008101403146.html?hpid=topnews.

### ii. Legal Analysis

The United Nations Convention Against Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment (Article 15), Dec. 10,
1984, 1465 U.N.T.S. 85 ("Convention" or "CAT"), requires that
governments which are party to it "ensure that any statement which
is established to have been made as a result of torture shall not
be invoked as evidence in any proceedings, except against a person

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

accused of torture as evidence that the statement was made."[22]  Id.
The Government has represented that it "recognizes torture to be
abhorrent and unlawful, and unequivocally adheres to humane
standards for all detainees. . . . Consistent with these policies
and with the treaty obligations imposed by the Convention on the
United States as a State Party, the [G]overnment does not and will
not rely upon statements it concludes were procured through torture
in the Guantanamo habeas litigation." Resp't's Br. in Resp. To the
Ct.'s Order of Sept. 4, 2009, at 1-2 [Dkt. No. 248].[23]

The Government does not challenge or deny the accuracy of
Binyam Mohamed's story of brutal treatment. Rather, it argues that
the Court should not adopt any automatic per se rule requiring
exclusion of the statements he made at Guantanamo Bay because they
were not "tainted" by any mistreatment by Special Agent ███████,

---

[22]   Under the Convention Against Torture, "torture" is
defined as "any act by which severe pain or suffering, whether
physical or emotional, is intentionally inflicted on a person for
such purposes as obtaining from him or a third person information
or a confession . . . when such pain or suffering is inflicted by
or at the instigation of or with the consent or acquiescence of a
public official or other person acting in an official capacity."
CAT, art. 1(1).

[23]   On September 4, 2009, the Court directed parties to
submit additional briefing regarding the admissibility of evidence
procured by torture. Specifically, parties were asked to address
federal and international law concerning: 1) the admissibility of
evidence procured by torture; and 2) the admissibility of evidence
procured from an individual who had been tortured prior to
providing the evidence upon which any party relies.

~~SECRET~~

-58-

SECRET

or anyone else at that detention center. The Government candidly "acknowledges that there is a dearth of precedent directly on point," and suggests using existing case law in the criminal area as a useful, albeit not perfect, analogy. Id. at 3. The Court agrees.[24]

In the criminal context, confessions or testimony procured by torture are excluded under the Due Process Clause because such admissions would run contrary to "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." Brown v. Mississippi, 297 U.S. 278, 286 (1936).[25] Also, as a practical matter, resort to coercive tactics by an interrogator renders the information less likely to be true. Linkletter v. Walker, 381 U.S. 618, 638 (1965). Courts must therefore determine if the confession or testimony was given voluntarily.

The use of coercion or torture to procure information does not automatically render subsequent confessions of that information

---

[24]     Petitioner claims that "U.S. federal law and treaties and norms of international law have outlawed torture and applied . . . a categorical rule of inadmissibility of evidence obtained directly or indirectly through torture." Pet.'s Mem. of Law Regarding Admissibility of Evidence Tainted by Torture, at 1 [Dkt. No. 247]. However, none of his citations support such a broad statement.

[25]     As the Supreme Court eloquently stated, "[t]he rack and torture chamber may not be substituted for the witness stand." Brown, 297 U.S. at 285-86.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

inadmissible. <u>United States v. Bayer</u>, 331 U.S. 532, 540-41 (1947). The effects of the initial coercion may be found to have dissipated to the point where the subsequent confessions can be considered voluntary. <u>Id.</u>; <u>Oregon v. Elstad</u>, 470 U.S. 298, 311-12 (1985) (discussing <u>Lyons v. Oklahoma</u>, 322 U.S. 596, 603 (1944)); <u>United States v. Karake</u>, 443 F. Supp. 2d 8, 86 (D.D.C. 2006). The Government bears the burden of showing that the confessions are voluntary. <u>Karake</u>, 443 F. Supp. 2d at 49-50.

To determine if the effects of the earlier coercion have dissipated--that is, to determine the voluntariness of the subsequent confessions--courts apply a "totality of the circumstances" test. <u>Id.</u> at 87. The Supreme Court has ruled that "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." <u>Elstad</u>, 470 U.S. at 310. Further, courts should examine, <u>inter alia</u>, the age, education, intelligence, and mental health of the witness; whether he has received advice regarding his Constitutional rights; the length of detention; the "repeated and prolonged nature of the questioning"; and the "use of physical punishment such as the deprivation of food or sleep." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).

This multi-factor inquiry aims to uncover whether there has

SECRET
-60-

SECRET

been a "break in the stream of events . . . sufficient to insulate the statement from the effect of all that went before." Clewis v. State of Texas, 386 U.S. 707, 710 (1967). The test has already been applied in the context of Guantanamo Bay litigation. See Al Rabiah v. United States, Civ. No. 02-828, classified op. at 51-52 (D.D.C. September 17, 2009) (finding that Government did not meet burden of showing dissipation of coercion). The Supreme Court's framework for deciding whether subsequent confessions are voluntary is to "determine[] the factual circumstances surrounding the confession, assess[] the psychological impact on the accused," and then issue a legal conclusion. Schneckloth, 412 U.S. at 226.

### iii. Reliability of Evidence Procured Subsequent to Torture

Under the framework contemplated by Schneckloth, id., the Court must assess the reliability of the facts surrounding the alleged mistreatment. In this case, the account in Binyam Mohamed's diary bears several indicia of reliability. First, it is extraordinarily detailed. The diary, written in the witness' own words, provides approximate dates at multiple points in the narrative, describes the physical features and conduct of guards and interrogators, and is consistent throughout several accounts. Second, the fact that Binyam Mohamed has vigorously and very publicly pursued his claims in British courts subsequent to his

SECRET
-61-

SECRET

release from Guantanamo Bay suggests that the horrific accounts of his torture were not simply stories created solely to exculpate himself. See David Stringer, Ex-Gitmo Detainees Sue UK to Make Evidence Public, The Associated Press, October 27, 2009, available at http://hosted.ap.org/dynamic/stories/E/EU_BRITAIN_GUANTANAMO ?SITE=FLTAM&SECTION=HOME&TEMPLATE=DEFAULT. His persistence in telling his story demonstrates his willingness to test the truth of his version of events in both the courts of law as well as the court of public opinion.

The record does not indicate whether the evidence procured under torture includes information related to Petitioner. Binyam Mohamed insists that it does not, as he did not know Petitioner until he arrived at Guantanamo Bay in 2004. JE 60. Indeed, the record of earlier interrogations of Binyam Mohamed does not include any mention of Petitioner. See JE 73. Significantly, the Government neither confirms nor denies his account of his abuse while in United States custody; instead, it focuses on the allegedly voluntary statements provided to Special Agent ███████ in the wake of Binyam Mohamed's mistreatment. Gov's Opp'n at 15-17.

Special Agent ███████ began his questioning of Binyam Mohamed at Bagram in July of 2004, just over two months after he was transferred from the Dark Prison. Following a September transfer

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

to Guantanamo Bay, the questioning continued. When considering the amount of time which has elapsed between the coerced confession and the subsequent one, courts have never insisted that a specific amount of time must pass before the taint of earlier mistreatment has dissipated. See, e.g., Lyons, 322 U.S. at 603-04 (twelve hours); United States v. Shi, 525 F.3d 709, 727 (9th Cir. 2008) (one day). Indeed, as a legal matter, it has been held that the effects of earlier coercion could last for nearly one year. See Al Rabiah, classified op. at 52 (finding that without Government evidence to the contrary, effects of torture could poison confession made nine months later).

A totality of the circumstances inquiry, therefore, cannot be reduced simply to mechanical computations of time. See Schneckloth, 412 U.S. at 226 ("The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances."). Where one court has found days to be sufficient to represent a dissipation in the effects of torture, another may require substantially more time. This Court concludes that the temporal break in this case was not long enough--given the length of the abuse, its severity, and the fact that it was targeted to overwhelm the Petitioner mentally as well as physically--to "insulate the statement from the effect of

SECRET
-63-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

all that went before." <u>Clewis</u>, 386 U.S. at 710.

First, Binyam Mohamed's lengthy and brutal experience in detention weighs heavily with the Court. For example, this is not a case where a person was repeatedly questioned by a police officer, in his own country, by his own fellow-citizens, at a police station, over several days without sleep and with only minimal amounts of food and water. See <u>Ashcraft v. State of Tenn.</u>, 322 U.S. 143, 153-54 (1944); <u>Reck v. Pate</u>, 367 U.S. 433, 440-41 (1961) (murder suspect held incommunicado for eight days, questioned extensively for four, and interrogated while sick). While neither the <u>Ashcraft</u> nor <u>Reck</u> scenarios are to be approved, they can hardly compare with the facts alleged here.

The difference, of course, is that Binyam Mohamed's trauma lasted for two long years. During that time, he was physically and psychologically tortured. His genitals were mutilated. He was deprived of sleep and food. He was summarily transported from one foreign prison to another. Captors held him in stress positions for days at a time. He was forced to listen to piercingly loud music and the screams of other prisoners while locked in a pitch-black cell. All the while, he was forced to inculpate himself and others in various plots to imperil Americans. The Government does not dispute this evidence.

~~SECRET~~

-64-

SECRET

Thus, the physical abuse in this case more closely resembles the conduct in <u>Brown v. Mississippi</u>, where suspects in a criminal investigation were brutally beaten, whipped, and exposed to mock executions in the days before making a coerced confession and being thrust into the courtroom for a one-day show trial. <u>See</u> 297 U.S. at 281-85.

Second, the psychological effects of this lengthy and inhumane treatment also persuade the Court that Binyam Mohamed's later statements made at Guantanamo Bay must be excluded because they are tainted by his prior experiences. There is a substantial body of scientific literature describing the effects of physical and psychological torture on prisoners.[26]

Torture and "enhanced interrogation techniques" employed by the Government during the War on Terror have been shown to be "geared toward creating anxiety or fear in the detainee while at the same time removing any form of control from the person to create a state of total helplessness." Metin Başoğlu, M.D., PhD.,

---

[26]    <u>See, e.g.</u>, Charles A. Morgan III <u>et al.</u>, <u>Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress</u>, 27 Int'l Journal of Law and Psychology 265 (2004); Morgan <u>et al.</u>, <u>Hormone Profiles in Humans Experiencing Military Survival Training</u>, 47 Biological Psychiatry 891 (2000); Morgan <u>et al.</u>, <u>Consistency of Memory for Combat-Related Traumatic Events in Veterans of Operation Desert Storm</u>, 154 Am. Journal of Psychiatry 173 (1997).

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

et al., <u>Torture vs Other Cruel, Inhuman, and Degrading Treatment:
Is the Distinction Real or Apparent?</u>, 64 Archives of Gen.
Psychiatry 277, 283 (2007). Indeed, rates of Post-Traumatic Stress
Disorder ("PTSD") in torture survivors far exceed the rate among
the general population. Physicians for Human Rights, <u>Leave No
Marks: Enhanced Interrogation Techniques and the Risk of
Criminality</u>, 43-44; 43 n.337 (Aug. 2007), <u>available at</u>
http://wwww.physiciansforhumanrights.org/library/documents/report
s/leave-no-marks.pdf (collecting journal articles that report rates
for torture victims higher than 3.6% rate of PTSD among general
population).

According to a new study about to be published in a peer-
reviewed journal, "prolonged and extreme stress has a deleterious
effect on frontal lobe function." Shane O'Mara, <u>Torturing the
Brain: On the Folk Psychology and Folk Neurobiology Motivating
"Enhanced and Coercive Interrogation Techniques"</u>, __ Trends in
Cognitive Sciences __ (forthcoming) (manuscript at 2), <u>available at</u>
http://download.cell.com/trends/cognitive-sciences/pdf/PIIS1364
661309001995.pdf (published Sept. 24, 2009).[27]

_____

[27]   Trends in Cognitive Sciences is a peer-reviewed
professional journal published in the United Kingdom by Elsevier.
The article cited is written by an Associate Professor in the
School of Psychology at Trinity College Dublin, in Ireland.

~~SECRET~~

-66-

~~SECRET~~

A common consequence of coercive interrogation techniques is "confabulation," or the "pathological production of false memories." Id. As the author explains, "[s]tress causes heightened excitability or arousal in the brain and body. . . . Experiencing stress causes release of stress hormones (cortisol and catecholamines . . . ) [which] provoke and control the 'fight or flight' response . . . that, if overly prolonged, can result in compromised cognitive neurobiological function (and even tissue loss) in [the prefrontal cortex and hippocampus]." Id. at 1. Because of these physiological reactions, the brain areas function improperly, and "both memory and executive functions (intention, planning[,] and regulation of behavio[]r) can be impaired." Id. The study specifically addresses the "folk psychology that is demonstrably incorrect"[28] underlying adoption of enhanced interrogation techniques. Id. at 1.

The author concludes that "[i]t is likely to be difficult or perhaps impossible to determine during interrogation whether the information that a suspect reveals is true: information presented

---

[28]   The author concludes that there is no scientific evidence supporting the neuropsychobiological model underlying the Government's adoption of coercive interrogation techniques. Id. at 1.   Quite the contrary--the article concludes that "these techniques are unlikely to do anything other than the opposite of that intended by coercive or 'enhanced' interrogation," i.e., to provide reliable, truthful, and accurate information.   Id.

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

by the captor to elicit responses during interrogation might inadvertently become part of the [subject's] memory, especially because [subjects] are under extreme stress and are required to tell and retell the same events that might have happened over a period of years." Id. at 2.

In this case, even though the identity of the individual interrogators changed (from nameless Pakistanis, to Moroccans, to Americans, and to Special Agent ▌█████), there is no question that throughout his ordeal Binyam Mohamed was being held at the behest of the United States.  Captors changed the sites of his detention, and frequently changed his location within each detention facility.  He was shuttled from country to country, and interrogated and beaten without having access to counsel until arriving at Guantanamo Bay, after being re-interrogated by Special Agent ▌█████.  See JE 72 (declaration of Binyam Mohamed's attorney, Clive Stafford Smith, stating that he did not meet with client until May of 2005).

From Binyam Mohamed's perspective, there was no legitimate reason to think that transfer to Guantanamo Bay foretold more humane treatment; it was, after all, the third time that he had been forced onto a plane and shuttled to a foreign country where he would be held under United States authority.  Further, throughout

SECRET
-68-

SECRET

his detention, a constant barrage of physical and psychological abuse was employed in order to manipulate him and program him into telling investigators what they wanted to hear. It is more than plausible[29] that, in an effort to please Special Agent ▇▇▇ (consistent with how captors taught him how to behave), he re-told such a story, adding details, such as Petitioner's presence at training, which he thought would be helpful and, above all, would bring an end to his nightmare.[30]

In Bagram, he wrote that he trained with three Algerians. JE 73 at 1902. When he arrived at Guantanamo Bay and, according to his subsequent statements, met Petitioner for the first time, he then reported that one of those unnamed Algerians was in fact Petitioner. JE 27 at 2; JE 36 at 5. Given the factors discussed above, the Court cannot credit this confession as voluntary. The earlier abuse had indeed "dominated the mind" of Binyam Mohamed to such a degree that his later statements to interrogators are unreliable. Lyons, 322 U.S. at 603; see also Leave No Marks at 117 ("The ultimate effect of [employing methods of psychological control] is to convince the victim that the perpetrator is omnipotent, that resistance is futile, and that his life depends on

---

[29]     See O'Mara, supra at page 66.

[30]     See Al Rabiah, classified op. at 50.

SECRET

-69-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

absolute compliance.").

In reaching this conclusion, the Court does not doubt the abilities or experience of Special Agent , nor his account of his humane treatment of the witness.   Rather, based on the factors discussed above, the Court finds that Binyam Mohamed's will was overborne by his lengthy prior torture, and therefore his confessions to Special Agent do not represent reliable evidence to detain Petitioner.

> d.   **Remaining Allegations Regarding Training**

Without Binyam Mohamed's statements implicating Petitioner in training, the Government's evidence supporting this allegation is severely weakened.

After three nights there, he

~~SECRET~~

-70-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

insists that he returned to Kabul.  <u>Id.</u>  According to Petitioner,

and

perhaps  reflects  a  misunderstanding  by  interrogators  that  he

He notes also

that the training allegations that Binyam Mohamed made involved

different locations than Bagram.   Traverse at 45-46.



SECRET

-71-

~~SECRET~~



Based on this record, the Court cannot credit the one sentence upon which the Government's claim ▮▮▮▮▮▮▮▮ now rests. As described above, we do not know who reported the comments regarding the ▮▮▮▮▮▮▮▮ and therefore it is impossible to assess that person's reliability. Additionally, the comment is not specific, and refers to ▮▮▮▮▮▮▮▮ training therefore cannot be sustained on this record.

### 6. Participation in Battle

The Government asserts that Petitioner participated in battle. This allegation rests only on highly speculative evidence. There is no eye-witness account of Petitioner engaging in battle.

The Government derives its evidence almost entirely from the comments contained on one page of an intelligence report from 2005. In that report, based on an interrogation of Petitioner, the author

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

remarks that "detainee admitted to ███████ authorities in the past that he fought on the front lines but is now recanting all of this with the American interrogators." JE 33 at 4. He also identified another detainee, ISN 197, by his kunya, "Abdul Haq." According to the report, "this is interesting because ISN 197 was only known by this alias while fighting" at Tora Bora. Id. The Government marshals additional evidence about Petitioner's travel pattern and his al-Qaida associations in order to buttress its argument.

The Court finds that the Government has not shown that it is more likely than not that Petitioner fought. The reported statement about Petitioner's admission to ███████ authorities is not reliable, as it represents multiple levels of hearsay: the Court cannot ascertain who the ███████ authorities are who allegedly received this information from Petitioner, nor to which United States official the information was then sent or transmitted.

As for the identification of Abdul Haq, Petitioner provides declarations from ISN 197 and his brother, in which the two claim that ISN 197 only adopted the kunya Abdul Haq after arriving at Guantanamo Bay. JE 66; JE 67. If true, this would contradict the intelligence report's assertion that ISN 197 only used that kunya

SECRET

-73-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

at Tora Bora. The Government supports this assertion by pointing
to an intelligence report where a detainee identifies ISN 197 as
Abdul Haq, the name by the detainee knew ISN 197 "while he was in
Afghanistan." JE 39 at 1. Even if the Government's evidence is
credited so as to resolve this dispute in its favor, that
establishes that ISN 197 and his brother lied about using the kunya
only at Guantanamo Bay. It would not establish that ISN 197 never
used the kunya at Guantanamo Bay. In short, there is no reliable
evidence that ISN 197 used the name Abdul Haq only at Tora Bora, as
the comments in JE 33 insist, and so Petitioner's identification of
ISN 197 is not probative of whether or not Petitioner fought at
Tora Bora.

The Government's reliance on comments in one intelligence
report cannot sustain this allegation. No witness places
Petitioner in battle, and no other evidence corroborates that
Petitioner made the comments attributed to Petitioner. The
Government's evidence regarding Petitioner's travel pattern, his
associations, and his alleged encounter of Bin Laden while passing
by a funeral in Kabul, JE 15 at 5, does not meet its burden to show
that it was more likely than not the Petitioner participated in
battle.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

IV. CONCLUSION

The Government has consistently urged the Court not to examine in isolation individual pieces of evidence presented in the habeas cases emanating from Guantanamo Bay, but rather to evaluate them "based on the evidence as a whole" in determining whether the allegations, when viewed together, support a conclusion that Petitioner has been justifiably detained.

After considering the evidence as a whole, the Court rejects the Government's conclusion. While the mosaic approach can be a useful tool, the evidence must also be carefully analyzed--major-issue-in-dispute by major-issue-in-dispute--since the whole cannot stand if its supporting components cannot survive scrutiny.

The facts of this case demonstrate the need for this analytical approach. Here, the Government has clearly proven, by far more than a preponderance of the evidence, that Petitioner traveled extensively in Europe, both before and after September 11, 2001, by using false names, passports, and other official documents. It has also proven, by far more than a preponderance of the evidence, that while in London Petitioner attended mosques which were well known to have radical, fundamentalist clerics advocating jihad. At one of the mosques he met a recruiter who then paid for and arranged his trip to Afghanistan along routes

SECRET
-75-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

well-traveled by those wishing to fight with al-Qaida and/or the Taliban against the United States and its allies. Finally, the Government has also proved, by far more than a preponderance of the evidence, that once Petitioner arrived in Afghanistan he stayed at a guesthouse with direct ties to al-Qaida and its training camps.

But the Government's evidence fails to prove anything more. The Government has failed to provide reliable evidence that Petitioner received any training in weaponry or fighting, or that he engaged in actual fighting of any kind on behalf of al-Qaida and/or the Taliban.

The question then becomes whether, under Gherebi and Hamlily, the Government's evidence meets the standard for detention.

Analyzing those two cases, the Court concludes that Petitioner's conduct does not meet the legal standard for detention.  In determining whether Petitioner was a member or substantial supporter of al-Qaida and/or the Taliban, or associated forces, the Court must consider whether he was a "member[] of the enemy organization's armed forces, as that term is intended under the laws of war."  Gherebi, 609 F. Supp. 2d at 70-71.  Both substantial supporters and members of al-Qaida and/or the Taliban must have occupied a role within "the military command structure of an enemy organization." Id. at 70.  A key indicator of such a role

SECRET
-76-

SECRET

is receiving and executing orders from the enemy force's "combat apparatus." Id. at 69. In determining who is "part of" al-Qaida and/or the Taliban, "[t]he key inquiry, then, is not necessarily whether one self-identifies as a member of the organization . . . but whether the individual functions or participates within or under the command structure of the organization--i.e., whether he receives and executes orders or directions." Hamlily, 616 F. Supp. 2d at 75.[31]

In this case, there is no evidence to show that it is more likely than not that Petitioner received and executed orders from the command structure of al-Qaida or that he was part of the enemy force's "combat apparatus." Petitioner had simply not yet reached that point in his journey to become a part of al-Qaida. The Government has provided credible and reliable evidence that he attended radical mosques in London, that he met a man named Rahim

---

[31]    Nor is actual fighting on a battlefield required.  See Gherebi, 609 F. Supp. 2d at 69 ("[T]he armed forces of the enemy consist of more than those individuals who would qualify as 'combatants' in an international armed conflict.") (citing International Committee of the Red Cross ("ICRC") commentary on Third Geneva Convention). "Thus, an al-Qa[i]da member tasked with housing, feeding, or transporting al-Qa[i]da fighters could be detained as part of the enemy armed forces notwithstanding his lack of involvement in the actual fighting itself. . . ." Id.; see also id. at 68 (reasoning that "[s]ympathizers, propagandists, and financiers who have no involvement with th[e] 'command structure[]'" are not part of armed forces, and therefore can only be detained if they engaged directly in hostilities).

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

who coordinated and funded his travel to Pakistan, that he was shepherded from Pakistan to Afghanistan by Rahim's contacts via an established corridor for transporting al-Qaida recruits, and that he stayed at a guesthouse that linked these recruits with training camps.

While these facts demonstrate that Petitioner was exposed to radical, anti-American rhetoric at mosques in London, and that he traveled to Afghanistan with the assistance of an al-Qaida-affiliated network, there is no evidence that Petitioner took orders from that network or from any "combat apparatus." Training may have been encouraged by guesthouse operators, but there is no evidence that it was required or ordered. JE 40 at 8. In short, at the point in his journey where the Government's evidence fails, Petitioner had not yet acquired a role within the "military command structure" of al-Qaida and/or the Taliban, nor acquired any membership in these enemy forces. One who merely follows a path, however well-trodden, from London to Afghanistan and ends up staying in an al-Qaida-affiliated guesthouse, cannot be said to occupy a "'structured' role in the 'hierarchy' of the enemy force." Gherebi, 609 F. Supp. 2d at 68.

Admittedly, there is a preponderance of evidence indicating that Petitioner was prepared to join al-Qaida and/or the Taliban,

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

and that he set out for Afghanistan with the intention of doing so.
But Mohammed did not actually join or substantially support enemy
forces simply by virtue of his attendance at the two mosques,
recruitment, travel, and guesthouse stay.

Sliti v. Bush, 592 F. Supp. 2d 46 (D.D.C. 2008), upon which
the Government relies, is therefore distinguishable. In that case,
the petition for habeas corpus was denied because petitioner
"traveled to Afghanistan as an [al-Qaida] recruit and trained at
the local military training camp proximate to the Tunisian
guesthouse in Jalalabad." Id. at 51 (emphasis added). The case
does not support the proposition that mosque attendance,
recruitment, travel, and guesthouse stay alone are sufficient bases
for detention.

Whether or not one believes that Petitioner was a potential
danger to the security of this country, or whether or not one
speculates that Petitioner would have attended a training camp and
then fought with al-Qaida and/or the Taliban if the opportunity
presented itself, is not relevant. The legal issue to be decided
is whether--based on the actual evidence presented--that evidence
satisfies the standard set forth in Gherebi and Hamlily for
determining whether Petitioner, at the time of his capture, was a
member or substantial supporter of the terrorist organizations

SECRET
-79-

SECRET

fighting against the United States and its allies. At the point at which he was detained, those requirements had not yet been met, even though they might well have been satisfied at some future time. In short, Petitioner may well have started down the path toward becoming a member or substantial supporter of al-Qaida and/or the Taliban, but on this record he had not yet achieved that status.

Mindful of the limitations on the scope of the remedy in this situation, see Kiyemba, 555 F.3d at 1024, the Court further orders the Government to take all necessary and appropriate diplomatic steps to facilitate Petitioner's release forthwith. Further, the Government is directed to comply with any reporting requirements mandated by the Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009), if applicable, to facilitate Petitioner's release, and to report back to the Court no later than December 17, 2009, as to the status of that release and what steps have been taken to secure that release.

November 17, 2009

/s/ Gladys Kessler
Gladys Kessler
United States District Judge

Copies to: Attorneys of Record via ECF

SECRET

-80-

SECRET

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FARHI SAEED BIN MOHAMMED, <u>et. al.</u>, | : |
| | : |
| | : |
| Petitioners, | : |
| | : |
| v. | : Civil Action No. 05-1347 (GK) |
| | : |
| BARACK H. OBAMA, <u>et. al.</u>, | : |
| | : |
| Respondents. | : |
| | : |

## ORDER

For the reasons set forth in this Court's Classified Memorandum Opinion of November /9, 2009, it is hereby

**ORDERED**, that Petitioner Farhi Saeed Bin Mohammed's petition for a writ of habeas corpus is **granted**; and it is further

**ORDERED**, that the Government take all necessary and appropriate diplomatic steps to facilitate Petitioner's release forthwith. Further, the Government is directed to comply with any reporting requirements mandated by the Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009), if applicable, to facilitate Petitioner's release, and to report back to the Court no later than **December /7**, 2009, as to the status of that release and what steps have been taken to secure that release.

November /7, 2009

/s/ Gladys Kessler

Gladys Kessler
United States District Judge

<u>Copies to</u>: Attorneys of Record via ECF

SECRET